RICKY ANDRE TATE AND DANIEL CORNELIUS HALL
*v.* STATE OF MARYLAND

[No. 1138, September Term, 1975.]

*Decided September 15, 1976.*

The cause was argued before MARVIN H. SMITH and IRVING A. LEVINE, Associate Judges of the Court of Appeals, and PERRY G. BOWEN, JR., Associate Judge of the Seventh Judicial Circuit, all specially assigned.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Dennis M. Henderson, Assistant Public Defender,* on the brief, for appellants.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Charles P. Strong, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

Appellants, Ricky Andre Tate and Daniel Cornelius Hall, were found guilty of rape, two counts of kidnapping, and unlawful use of a handgun in the commission of a crime of violence after a jury trial in the Circuit Court for Prince George's County (Bowie, J.). Both appeal their convictions. We affirm.

Evidence presented at trial, if believed, supports the following statement of facts. In the late evening of March 1, 1975, Calvin Williams, who was working as a cab driver, drove to an address in Prince George's County pursuant to a call from the company dispatcher. He was at that time in the company of a female friend, Marjorie Todd. Appellants entered the cab at the Prince George's County address and directed Williams to take them to an address in the District of Columbia. Upon reaching their destination, Hall pointed a gun at Williams and said, "This is a holdup," whereupon Williams surrendered $30. Tate then took control of the cab, and with Williams in the front seat beside him, and with

Hall and Todd in the rear seat, he continued driving on a journey lasting some hours. Several stops were made, and on one of these occasions, in Riverdale in Prince George's County, Williams was ordered out of the cab. During the course of this odyssey, Todd was repeatedly raped by Hall. Finally, after delivering Hall at his residence in the District of Columbia, Tate, now in possession of the gun, took Todd to his mother's house in Prince George's County where, in his own bedroom, he proceeded to rape her. Todd was permitted to depart in the morning.

I

The first issue raised by appellants concerns the jurisdiction of the Maryland court to try them for the kidnappings which they urge occurred in the District of Columbia. Though not raised below, such issues of subject matter jurisdiction may, of course, be raised on appeal. Maryland Rule 1085; *Wilson v. State,* 21 Md. App. 557, 571, 321 A. 2d 549, *cert. denied,* 272 Md. 751 (1974); *see Resh v. Resh,* 271 Md. 133, 137, 314 A. 2d 109 (1974).

The undisputed evidence adduced at trial shows that appellants forcibly abducted Todd and Williams, if at all, in the District of Columbia, and then transported them to and within the State of Maryland. Appellants argue that because the abduction occurred outside Maryland, the Maryland courts are "without jurisdiction" to try them for the offense. We do not agree.

At common law, kidnapping is defined as the forcible abduction and carrying away of a man, woman or child from his own country into another. Clark & Marshall, Law of Crimes § 10.23 (7th ed. 1967); 4 W. Blackstone, Commentaries *219. It is an aggravated form of false imprisonment, embracing all of the elements of that offense and adding to it an asportation of the victim out of his own country. *See Hunt v. State,* 12 Md. App. 286, 310, 278 A. 2d 637, *cert. denied,* 263 Md. 715 (1971); Perkins, Criminal Law 176 (2d ed. 1969). The principal source of the aggravation lies in the carrying of the victim beyond the protection of the

laws of his country. *See* 1 R. Anderson, Wharton's Criminal Law and Procedure § 371 (1957).

In Maryland the crime of kidnapping is controlled by statute, and though the crime as statutorily defined is based on the common law offense, several relevant changes have been made. Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 337 provides:

> "Every person, his counsellors, aiders or abettors, who shall be convicted of the crime of kidnapping and forcibly *or fraudulently* carrying or causing to be *carried* out of or *within* this State any person . . . with intent to have such person *carried* out of or within this State, or with the intent to have such person concealed within the State or without the State, shall be guilty of a felony . . . ." (emphasis added).

First, it is made clear in § 337 that a forcible carrying away of the victim is not required. Among the common law authorities there was some dispute as to whether a carrying with consent, fraudulently obtained, constituted kidnapping. *See* Annot., 95 A.L.R.2d 450 (1964). Fraudulent carrying does constitute kidnapping under § 337. *See Shrader v. State*, 10 Md. App. 94, 99-100, 268 A. 2d 257 (1970).

Secondly, the common law requirement that the victim be carried out of his own country (or state) has been modified. Carrying within the state is sufficient to make out the § 337 offense. *Midgett v. State*, 216 Md. 26, 38, 139 A. 2d 209 (1958). And finally, an abduction, a forcible "carrying away," is not necessary to kidnapping as defined in § 337. The determinative element is the carrying itself. Compare *State v. McGee*, 336 Mo. 1082, 83 S.W.2d 98, 110 (1935).

In sum, whatever might be said of the common law offense, it is apparent, in light of the changes wrought by § 337, that the gist of the offense of kidnapping in Maryland is unlawful confinement coupled with transportation of the victim. *Cf. Collier v. Vaccaro*, 51 F. 2d 17, 19 (4th Cir. 1931). The initial assaultive taking of the person and the carrying

out of the state required at common law are not part of the § 337 offense. Thus, since the undisputed evidence shows that the victims here were unlawfully confined and carried forcibly within this state, a violation of § 337 based solely on acts committed within the state was established. The circuit court therefore had jurisdiction to try appellants for the offense.

## II

During cross-examination, the state's attorney asked Tate, over objection of counsel, if he knew that he could "also get much less than [life imprisonment] in the discretion of the Court." Appellants contend that because of this questioning, the jury was impermissibly informed of the discretion of the court in passing sentence.

The Court of Appeals held in *Shoemaker v. State*, 228 Md. 462, 468-74, 180 A. 2d 682 (1962), that it was improper for a prosecutor to make reference to such possibilities as the right of appeal, the possibility of executive clemency or parole, and so forth. The danger recognized in *Shoemaker* is that such information is irrelevant and tends to suggest "to the jury that it might in part shift its responsibility for a finding of the defendant's guilt to some other body." *Id.*, 228 Md. at 469. We recognize that such a danger may also exist in informing the jury of the discretion of the trial judge in passing sentence.

Here, however, the discussion of possible sentencing was initiated by one of the defendants. Tate was first asked by counsel in direct examination, and over objection by the state's attorney, whether he knew that the crime of rape carried a penalty of life imprisonment. Thus, the defense opened the door, making what had been irrelevant testimony relevant to an issue then in the case. It was not error for the trial court to permit such cross-examination to rebut what was offered, over objection, on direct examination and counteract the resulting prejudice to the State's case. *See Gorsuch v. Rutledge*, 70 Md. 272, 276, 17 A. 76 (1889); *Milburn v. State*, 1 Md. 1, 14 (1851).

## III

Appellants also assign a supposed error in the instruction given to the jury by the trial court. No objection was made to the instruction, however, in the court below, and that issue is not, therefore, properly before us on appeal. *See* Maryland Rule 756 g. Nor can we understand appellants' contention that there was plain error, within the meaning of Rule 756 g, entitling this Court to take cognizance of it when appellants concede that the instruction given was technically correct.

## IV

At the trial a wallet identified as belonging to the cab driver, Williams, which had been found by police officers in Tate's bedroom, was admitted into evidence over objection. Appellants argued below, as they do now, that the wallet was obtained by the police as a result of an illegal search and seizure.

The purported authority for the search of the bedroom was the consent of Tate's mother, Dorothy E. Harper, the search being without a warrant. It seems that Officers Seckel, Warner and others went to the Harper house, described to them by Todd. Upon being admitted to the house, the officers asked Harper the whereabouts of her son and received permission to search the house for him. Later, according to Warner, Harper gave him permission to conduct a search of the house for evidence. Harper denied this at trial, but the issue being one of credibility, the trial court was free to reject Harper's version and accept the testimony of the officers; indeed, we do not understand appellants to challenge on appeal the finding that consent for a search was given by Harper.

The thrust of appellants'[1] argument is that Harper lacked

---

1. We note a probable lack of standing in the case of appellant Hall to raise this issue since it nowhere appears that he had any interest in the premises subjected to the search. *See* Duncan and Smith v. State, 27 Md. App. 302, 304, 317, 340 A. 2d 722 (1975), *rev'd on other grounds,* 276 Md. 715, 351 A. 2d 144 (1976).

authority to consent to a search of her son's bedroom. The undisputed testimony indicates that Harper was the owner of the house and that Tate, her 17-year-old son, was the sole user of an upstairs bedroom for which he paid no rent. Tate apparently had begun using the room only two or three weeks prior to the day of the search.

That the consent of one who possesses common authority over premises is valid against an absent, nonconsenting person with whom authority is shared is now well settled. *United States v. Matlock*, 415 U. S. 164, 170, 94 S. Ct. 988, 39 L.Ed.2d 242 (1974); *see Coolidge v. New Hampshire*, 403 U. S. 443, 487-90, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971). The sole question here, then, is whether, under these circumstances, Harper, as sole owner of the premises and parent of the objecting, nonconsenting minor, possessed common authority over or other sufficient relationship to the premises as to authorize her consent. We believe that she did.

This issue of third party consent was addressed under strikingly similar circumstances by this Court in *Jones v. State*, 13 Md. App. 309, 283 A. 2d 184 (1971), *cert. denied*, 264 Md. 749 (1972). In that case the mother of a 20-year-old defendant gave permission for a search of his bedroom. There, as here, the mother testified that her son's bedroom was his alone, but that he paid no rent. The Court found as dispositive, in upholding the validity of the search, the fact that:

> "Appellant's mother had the sole control, power and superior right to exclude others, including the appellant, from her home, and also from the very bedroom that the appellant used. It was her free and voluntary choice to allow the police to search her house." *Id.*, 13 Md. App. at 315 (citations omitted).

While it is true that in *Jones* the defendant was present and offered no objection when consent for the search was given, we do not consider that fact significant. What is crucial and dispositive, in our view, is that Harper possessed not only a

common authority with Tate over the searched premises, but in fact possessed superior authority under these circumstances, including the right to exclude him from the premises.

Appellants rely heavily for their argument on a footnote in *United States v. Matlock, supra*, 415 U. S. at 171 n.7, where the Supreme Court noted that:

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v. United States*, 365 U. S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U. S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access *or control* for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (emphasis added).

Their reliance is misplaced, however, since it is clear, from the authorities cited by the Court, that in cautioning against a determination based on property rights alone, the Court had in mind the situation, for example, where title to the premises is vested in the one giving consent, but the right of possession is vested in the defendant.

In a case such as this, where the one giving consent possesses complete ownership, control and right of possession, the question is quite different. Nor is this a case involving the search of personal effects. *See, e.g., United States v. Bussey*, 507 F. 2d 1096, 1097 (9th Cir. 1974); *State v.*

*Evans*, 45 Haw. 622, 372 P. 2d 365, 372 (1962). We therefore hold that the consent for the search was valid.

*Judgments affirmed.*