470 A.2d 1327

**Donald BRAXTON**

v.

**STATE of Maryland.**

**No. 560, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Feb. 8, 1984.

Certiorari Denied June 7, 1984.

540

Luther C. West, Baltimore, for appellant.

Ann E. Singleton, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City, M. Sam Brave and Keith E. Mathews, Asst. State's Attys., for Baltimore City on the brief, for appellee.

Argued before GILBERT, C.J., and ALPERT and BELL, JJ.

ALPERT, Judge.

Doctor George Franklin Phillips, a prominent Baltimore physician, was murdered shortly after 10:00 p.m. on September 21, 1981. Following a lengthy jury trial in the Circuit Court for Baltimore City (Perrott, J., presiding), Donald

Braxton, appellant, was convicted of attempted robbery with a deadly weapon, felony murder, and use of a handgun while committing a crime of violence. Appellant was sentenced to a term of life imprisonment on the felony murder charge and a consecutive fifteen-year term for the handgun violation.

On appeal, appellant asks us to consider:

I. Whether the trial court erred by denying appellant the opportunity to deny an admission of guilt attributed to him by a State witness?

II. Whether there was sufficient corroboration of accomplices' testimony to sustain the convictions?

III. Whether appellant was accorded due process?

We find each of appellant's issues to be without merit and shall affirm his convictions.

## FACTS

A basketball game at City Public School 29 ended shortly before 10:00 p.m. on September 21, 1981. Six teenage youths remained on the school's playground—Gregory Brittingham, Eric Brown, Dean Wright, Walter Vaughn, Kevin Smith and appellant. Testifying as State witnesses, Brittingham and Brown explained the events preceding Dr. Phillips' murder.[1] Brown had taken his father's gun to school earlier that day and shown it to appellant. As they departed the school grounds that evening, appellant asked Brown if he still had the gun. Without saying anything, Brown handed appellant the gun. Appellant test-fired the gun and stated that "he wanted to make some money." The six teenagers walked down Bentalou Street and saw Dr. Phillips walking towards his automobile. Phillips entered his car and appellant said "let's get him." Wright grabbed the driver's side car door, held it open and demanded the doctor's money. Appellant repeated that demand. Mean-

---

1. In exchange for their truthful testimony, bail was reduced to $10,000. and the State agreed not to oppose reverse waiver to juvenile court.

while, Smith went to the passenger side car door and tried to enter the car. Doctor Phillips reached across the front seat and locked the passenger door. At that point appellant shot Dr. Phillips and the assailants fled. Dr. Phillips crawled a short distance from his automobile and died minutes later.

Brittingham testified that when he saw appellant the following day appellant said, "Don't you know, the man I shot, he was a doctor and he died." Appellant then took Brittingham to view the police drawn chalk lines where the body had been found. A few days later, when asked why he had shot Phillips, appellant explained that he had to because the doctor had seen his face.

Eric Brown also saw appellant the day after the murder. Brown and his brother met appellant at Wright's house. Appellant told them that "he shot the doctor because he would have recognized him."

## I.

As part of the State's case-in-chief, Lindsay Blackwell, conceded by the appellant in his brief to be "an independent witness, who sought no advantage from the State," testified that he had overheard a conversation between one Stevie Williams and the appellant. This alleged conversation took place on October 2, 1981, in the bleacher section of Carver High School's football stadium during a football game. We set out the pertinent testimony:

BY [Assistant State's Attorney]:

Q What, if anything, did Stevie say to Donald Braxton?

A He said, "I heard you shot the doctor."

[Appellant's Trial Counsel]:

 Objection.

THE COURT: Overruled.

[Assistant State's Attorney]:

Q What, if anything, did Donald Braxton say?

A He said, "Who told you?"

\* \* \* \* \* \*

[Assistant State's Attorney]:

Q Now, tell us everything that you heard Donald Braxton say about that subject alone (a robbery and shooting).

[Appellant's Trial Counsel]: Objection.

THE COURT: Overruled.

A He said, Hey, some of the people was with him—

[Assistant State's Attorney]:

Q I don't mean to interrupt, but who did Donald Braxton say was with him?

[Appellant's Trial Counsel]: Objection.

THE COURT: Overruled.

A Dean.

\* \* \* \* \* \*

Q What is [Dean's] full name?

A Dean Wright.

\* \* \* \* \* \*

[Assistant State's Attorney]:

Q What, if anything, did Donald Braxton say he was doing when he was with them?

[Appellant's Trial Counsel]: Objection.

A Held the gun.

THE COURT: Overruled. I didn't hear the answer.

A He had the gun.

Appellant contends that the trial judge committed reversible error when he denied the appellant the right (through hearsay) to deny, contradict, or disprove the admissions attributed to him by Blackwell and that he was denied the right to submit evidence as to the *entire conversation* that took place involving himself and Stevie Williams at the football stadium. He asserts that the prosecutor "persistently took the position that any attempt by the defendant to deny he made the statements to Mr. Williams in Mr. Blackwell's hearing would be self-serving hearsay" and that "the court just as persistently agreed with him."

 It is a general rule that self-serving declarations— that is, statements favorable to the interest of the declarant—are not admissible in evidence as proof of the facts asserted in the declaration. This rule is the same in criminal prosecutions. 2 *Wharton's Criminal Evidence* § 303 (13 ed. Torcia 1972) (and cases cited therein); 29 Am.Jur.2d *Evidence* § 621 (1967) (and cases cited therein). *See also Kaefer v. State,* 143 Md. 151, 158–59, 122 A. 30 (1923).[2] Under this general rule, the real objection is the hearsay character of the self-serving statements, but it is subject to a number of exceptions. For example, the accused in a criminal prosecution is entitled to the benefit of the entire conversation in which an admission introduced in evidence against him was made, notwithstanding the fact that a part of the conversation is self-serving. *Williams v. State,* 205 Md. 470, 473, 109 A.2d 89 (1954); 2 *Wharton's Criminal Evidence* § 304; 29 Am.Jur.2d *Evidence* §§ 535, 622. A criminal defendant may also introduce self-serving statements to demonstrate that his actions were performed under direction of the law. 2 *Wharton's Criminal Evidence* § 305.

We acknowledge the appellant's right (through admissible evidence) to deny, contradict or disprove the admissions attributed to him by Blackwell. Our thorough examination of the record reveals, however, that the trial judge was attempting to exclude inadmissible *self-serving statements* of exoneration uttered by appellant. We shall explain our conclusion by reviewing the testimony of Williams and appellant.

## A. *The Stevie Williams' Testimony*

The trial judge's decision can be best understood in light of the arguments by counsel out of the presence of the jury before Stevie Williams took the witness stand:

---

2. It is interesting to note that the issue of "self-serving declarations" has not been addressed in a Maryland criminal case for more than sixty years.

[Assistant State's Attorney]: Well, Your Honor, I don't pretend to know what Stevie Williams is going to testify to tomorrow. I know what he testified to in front of the grand jury, and I would say, it is entirely improper. That if [Appellant's Trial Counsel] follows this line of questioning: And were you present when Donald Braxton had a conversation with Lindsay Blackwell? and the answer is: Yes, I was, and if [Appellant's Trial Counsel] then asked: What was that conversation? I say, it is not admissible for Stevie Williams to say Donald Braxton denied any involvement in the murder.

THE COURT: I think you are right. It is hearsay. And if [Appellant's Trial Counsel] is bringing him on the stand for any reason closely proximating that, I ask that he may want to reconsider putting him on the stand. [Appellant's Trial Counsel] is going to have to make that judgment on his own. [Appellant's Trial Counsel], I think, knows what hearsay is and its exceptions.

[Appellant's Trial Counsel]: Your Honor, I am not going to argue that at this time. I proffer the question and [Assistant State's Attorney] can object to it.

[Assistant State's Attorney]: I ask that the question not be asked.

THE COURT: Wait a moment, gentlemen. I realize the hour is growing late and tempers are getting high.

[Appellant's Trial Counsel]: I'm calm.

[Assistant State's Attorney]: I'm pretty calm too.

THE COURT: Fine. Stay that way. Now, let us go through the same procedure, gentlemen, that we have with these other witnesses, where there has been a possible Fifth Amendment problem. [Appellant's Trial Counsel], interrogate the man after he's been advised of his constitutional rights, and you will know exactly what it is. I am not going to let hearsay come in if I can avoid it. So let us just handle it the same way we did the other witnesses when there was a Fifth Amendment problem.

Now, anything else we should take up?

The court then recessed until the next morning, Tuesday, March 16, 1982. Further discussion on Stevie Williams' testimony ensued.

[Assistant State's Attorney]: I have already alerted the Court that Stevie Williams at one point admits that he was present and hears the statement of the defendant denying his involvement of the shooting.

THE COURT: That is not admissible, and I have ruled that.

[Assistant State's Attorney]: Does the witness know that?

[Appellant's Trial Counsel]: I am not going to ask him that, [Assistant State's Attorney].

THE COURT: [Appellant's Trial Counsel] heard the Court's ruling.

[Assistant State's Attorney]: As long as we understand, Your Honor, we are not going to hear that.

THE COURT: I don't want to screen any witness. I really think that's highly unnecessary unless we have a Fifth Amendment problem. We have spent most of the morning resolving the problem, there is no Fifth Amendment problem with Mr. Williams. [Appellant's Trial Counsel] heard me say yesterday, that that particular question and answer would not be admissible, and I am going to rely on his good judgment.

More important, upon his common sense not to get himself into that situation, after the Court has specifically ruled.

[Assistant State's Attorney]: I am not worried so much about [Appellant's Trial Counsel], I am worried about the witness who might not be aware of that ruling of the Court, and might somehow in answer to some question slip in that the defendant denied it. I think perhaps to prevent that possibility, maybe the witness could be warned.

[Appellant's Trial Counsel]: Your Honor, I am not going to ask the question. If someway in cross examination he could blurt it out, it is really still testimony that is

admissible. I have never made an issue out of it because I never intended to ask him that. I never asked that and don't know what his answer is.

Perhaps defense counsel never intended to ask a question of Stevie Williams the potential answer to which was of such great concern to the prosecutor. Defense counsel may have elected, possibly for tactical reasons, not to ask Stevie Williams what, if anything, the appellant said to him at the football game. In any event, we note that at no time did defense counsel advise the court that he was offering the Stevie Williams testimony not for the truth of appellant's response but in order to impeach the testimony of Lindsay Blackwell. *See, e.g., Smith v. State,* 273 Md. 152, 161, 328 A.2d 274 (1974). Neither did defense counsel suggest to the court that the alleged denial was being offered as an exception to the hearsay evidence rule or under the doctrine of verbal completeness. For a discussion of the verbal completeness doctrine, *see Bowers v. State,* 298 Md. 115, 134, 468 A.2d 101 (1983). Although the prosecutor submitted a hypothetical question and answer, the appellant submitted no proffer of testimony. Therefore, appellant's present theory of admissibility was neither tried nor decided by the trial judge and we ought not consider it. *See Brown v. State,* 1 Md.App. 571, 576, 232 A.2d 261, *cert. denied,* 248 Md. 733 (1967); Maryland Rule 1085. One of the principal purposes of this rule is to require counsel to bring the position of their clients to the attention of the lower court at the trial, so that the trial court can pass upon and possibly avoid or correct any errors in the proceedings. *See Clayman v. Prince George's Co.,* 266 Md. 409, 416, 292 A.2d 689 (1972). Finally, as we said in *Funkhouser v. State,* 51 Md.App. 16, 24, 440 A.2d 1114 (1982), "the grant of a motion *in limine* cannot in and of itself constitute reversible error."

■ *Accordingly, we hold that refusal to permit an answer to a question which on its face called for hearsay (a self-serving declaration) is not error where trial counsel fails to show that the purpose of the question is to elicit non-hearsay*

or evidence which would be considered as an exception to the hearsay rule.

■ Assuming arguendo that the trial judge should have assumed that the controversial testimony was being offered as an exception to the hearsay rule, error in that regard was harmless beyond a reasonable doubt. Any error of exclusion was cured by facts established otherwise. *Baldwin v. State,* 226 Md. 409, 414–15, 174 A.2d 57 (1961). *See also* 5 Am. Jur.2d *Appeal & Error* § 806 (1964). Lindsay Blackwell's testimony was contradicted by the appellant himself and also by the testimony of Stevie Williams when he indicated that because of crowd noise nobody could hear anyone else without shouting; by the testimony of Rufus Maurice Rouse, who confirmed that the crowd was so noisy that it was impossible to hear conversations and that he did not hear any conversation with the appellant; and by William Campbell, who indicated that the appellant himself was not talking about the shooting and that the crowd was so noisy nobody could have overheard any such conversation. Campbell further indicated that the appellant was not present during the football game when the others were discussing the murder.

### B. *Appellant's Testimony*

■ Appellant also contends that he was denied the right "personally to deny that he made the incriminating statements attributed to him therein by Mr. Blackwell." Again the record reveals that this was not the case. After unequivocally denying that he shot Dr. Phillips, the appellant was asked by his attorney:

[APPELLANT'S TRIAL COUNSEL]:

Q Did you at that time in the presence of anybody make any *admission* that you were involved in the—

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: Sustained.

[APPELLANT'S TRIAL COUNSEL]: May I complete the question, Your Honor?

THE COURT: [Appellant's Trial Counsel], I know what the question is as well as you do, and the answer is no. Move on.

(Emphasis supplied.)

Although the trial judge may have abused his discretion by not allowing trial counsel to complete his question, the question at that point did appear to improperly call for a conclusion.

> Admissions or declarations, to be competent, must have been expressed in definite, certain, and unequivocal language. In other words, for such a statement to be admissible, it must be definite, certain, and unequivocal and distinctly import the fact of which it is offered as an assertion. The evidence relating to the admission or declaration should not be in the form of a conclusion, opinion, or understanding acquired by the witness from unexplained acts or words of the declarant.

29 Am.Jur.2d *Evidence* § 604. *See also Smith v. United States,* 283 F.2d 16, 18–19 (6th Cir.1960), *cert. denied,* 365 U.S. 847, 81 S.Ct. 808, 5 L.Ed.2d 811 (1961); *Hendrix v. State,* 200 Md. 380, 390, 90 A.2d 186 (1952); *McCormick on Evidence* § 12 (2d Ed.1972). Trial counsel neither sought to rephrase the question, nor to proffer an appropriate question and answer. Thus the issue is not preserved for appellate review. *See* discussion I–A *supra.* Even if appellant's trial counsel intended to elicit (a denial of) the fact of admitting rather than (a denial of) the legal conclusion of making an "admission" and the matter was properly before us, any error was cured[3] through the prosecutor's cross-examination:

[Assistant State's Attorney]:

Q You deny telling Stevie Williams that you shot the doctor and mentioning the other name?

A Yes, I do. I deny it.

Q Lindsay Blackwell is lying about that, isn't he?

---

3. *See Baldwin, supra.*

A Yes, sir.

Q He's lying about it because he's a junkie and will do anything for money?

A I guess so.

Thus, the search for the truth led the triers of the fact to one of two possible choices. They could believe the testimony of Lindsay Blackwell and thus disbelieve the appellant, Stevie Williams, Rufus Rouse and William Campbell, or, conversely, the testimony of the appellant and Messrs. Williams, Rouse and Campbell might have raised reasonable doubt in the minds of the jury, possibly resulting in acquittal. The jury obviously did not believe the testimony of the appellant or his witnesses and conviction resulted.

## II.

Appellant contends that the testimony presented by Brittingham and Brown, two accomplices in this crime, lacked sufficient corroboration demonstrating appellant's participation in the murder.

■ Of course, an accused may not be convicted solely on the basis of an accomplice's uncorroborated testimony. *Brown v. State,* 281 Md. 241, 242–44, 378 A.2d 1104 (1977). This protects against instances where an accomplice, "admittedly contaminated with guilt," falsely implicates an innocent person in order to "gratify his malice or to shield himself from punishment, or in the hope of receiving clemency by turning State's evidence." *Watson v. State,* 208 Md. 210, 217, 117 A.2d 549 (1955). The Court of Appeals has delineated the quantum of corroborative evidence necessary to sustain a conviction based in part on the testimony of an accomplice.

Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the

crime or (2) to show the participation of the accused in the crime itself. *See Wright v. State,* 219 Md. 643, 150 A.2d 733 (1959). If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. *McDowell v. State,* 231 Md. 205, 189 A.2d 611 (1963). That corroboration need not extend to every detail and indeed may even be circumstantial is also settled by our cases. *Nolan v. State,* 213 Md. 298, 131 A.2d 851 (1957); *Brown v. State,* 210 Md. 301 [123 A.2d 324] (1956).

*Brown, supra* 281 Md. at 244–45, 378 A.2d 1104.

■ Testimony presented by other State witnesses as well as State introduced physical evidence refutes appellant's contention that the accomplices' testimony was insufficiently corroborated. Perry Brown, Eric's brother, testified that Eric told him about the shooting when Eric arrived home that night. Perry related how he had accompanied Eric to Wright's home the following day and heard appellant say "he didn't mean to shoot the doctor, he had to or he could have recognized him." As discussed in Part I of this opinion, another State witness, Lindsay Blackwell, explained how he had seen appellant at a high school football game a few days after the murder. Blackwell watched as appellant took a seat with some friends in the bleachers. Blackwell testified he heard Stevie Williams say to appellant, "I heard you shot the doctor." Appellant's response was, "Who told you?" Further corroboration was provided through Alvin Spell, who testified that he had purchased the murder weapon from Kevin Smith. Spell identified Smith as the person who sold him the gun and appellant as the person who had been present during a meeting to discuss the sale price of the gun. Ballistics test evidence was introduced establishing that the gun purchased by Spell was used to kill Dr. Phillips.

Corroborative evidence was also provided to place appellant at or near the scene of the crime. Appellant himself admitted to being with Dean Wright that night. Wright's

fingerprints were found on Dr. Phillips' car. Other defense witnesses stated they observed appellant walking from the School 29 basketball courts. Appellant acknowledged knowing each of the other five youths originally charged with the crime.

Still, appellant denied involvement in the murder and presented an alibi defense that he was home well before 10:00 p.m. watching a Monday Night professional football telecast, drinking beer, eating cereal and speaking with his girlfriend on the telephone.

In sum, we find the State presented abundant corroboration of Brittingham and Brown's testimony through non-accomplice testimony and presentation of physical evidence. The jury was clearly presented with sufficient evidence to identify appellant with the other perpetrators of this crime and to show his participation in the murder. *Brown, supra.*

### III.

Appellant presents a panoply of perceived due process violations allegedly caused by the conduct of the trial judge and Assistant State's Attorneys. We shall address each separately.

### A.

First, appellant challenges the prosecutor's two references to the fact that appellant, if convicted, was not eligible for the death penalty. In his brief, appellant maintains that these actions were "reasonably calculated [to] give the jury a more appealing invitation to convict Mr. Braxton (a 16 year old youth) of first degree murder."

We emphatically disagree with this characterization. In fact, we find it was *appellant* who calculatingly injected irrelevant references to a possible death sentence.

The first reference came about during the cross-examination of Greg Brittingham. Appellant's trial counsel inquired whether Brittingham realized he would receive a death sentence. Brittingham responded that that thought had not occurred to him but that his mother had discussed the

possibility with him. At that point an Assistant State's Attorney objected and stated that "nobody on trial here is subject to the death penalty."

Further mention of the death penalty happened during Eric Brown's cross-examination. Appellant's counsel queried whether the witness' brother Perry had told him that "somebody might get the [cyanide] pill for killing the doctor." The State's objection was sustained and the prosecutor commented, "Counsel knows this is not a death penalty case." The trial judge commented that "this is no secret to the jury."

Counsel for appellant brought up the ultimate sentence again during his closing argument. Once more the State's objection was sustained.

As appellant repeatedly "opened the door" by raising the death penalty issue, it was entirely proper for the prosecution to "close the door" by correcting counsel's misleading and erroneous allusions. *Tate and Hall v. State,* 32 Md.App. 613, 617, 363 A.2d 622, *cert. denied,* 278 Md. 723, 736 (1976).

### B.

■ Second, appellant insists that the State impermissibly used Brittingham's prior consistent testimony before the grand jury to show that appellant was the trigger man in the murder.

On direct examination, Brittingham stated that appellant shot Dr. Phillips. On cross-examination, Brittingham admitted he had not told the grand jury the full story in that he failed to tell the grand jury that he knew appellant had a gun when they left the school ballyard. He did add, however, that the remainder of his grand jury testimony was accurate. Upon redirect examination, the Assistant State's Attorney asked whether Brittingham had told the grand jury that appellant shot the doctor. The witness could not recall and the prosecutor attempted to show Brittingham his grand jury testimony. Appellant objected that the State sought to impeach its own witness. This objection was overruled since the witness had been impeached on cross-ex-

amination, appellant had "opened the door" for grand jury testimony and because the witness could not remember his testimony. The trial court emphasized that refreshing a witness' recollection was different than impeaching a party's own witness.

The trial court correctly ruled on appellant's objection. Manifestly, Brittingham's credibility had been impeached by appellant. Thus, the State was entitled to put forth evidence to rehabilitate the witness' credibility. *Washington v. State,* 293 Md. 465, 469, 445 A.2d 684 (1982). Moreover, the State employed proper procedures for refreshing this witness' recollection by allowing Brittingham the opportunity to review his grand jury testimony transcripts. *Baker v. State,* 35 Md.App. 593, 371 A.2d 699 (1977).

### C.

At trial, Howard Gersh, an Assistant State's Attorney, testified during the State's case-in-chief to explain the deals offered for the testimony of Brittingham and Brown. See note 1, *supra.* Appellant objected to this testimony at trial on the grounds that such testimony was proper only in rebuttal.

■ On appeal, appellant has changed his grounds for objecting to Gersh's testimony. He now questions the relevancy of this testimony. Where a party specifies the grounds for objection, as appellant did at the trial below, he is bound to that ground and waives any other objections not stated. *von Lusch v. State,* 31 Md.App. 271, 285–86, 356 A.2d 277, *rev'd on other grounds,* 279 Md. 255, 368 A.2d 468 (1977).

■ Nevertheless, we shall address and dismiss this newly raised issue for reasons similar to those expressed in part III A of this opinion. During cross-examination of Brittingham and Brown, appellant requested that these State witnesses explain what incentives they had been offered for their testimony. Hence, again, appellant "opened the door" on this issue and the State was justified in presenting Gersh's testimony. *Tate and Hall, supra.*

## D.

 Appellant's final due process claim questions the prosecutor's "forc[ing appellant's trial counsel] to proffer the testimony of what he believed to be his key witnesses' testimony, and not being satisfied with this, forc[ing] him to submit to a 'screening' of their testimony by the court prior to their testifying."

We summarize the necessary background for a fuller understanding of this issue. In the midst of the trial, appellant furnished the prosecution with the names of three prospective witnesses. These names had not been provided in discovery or included in appellant's *voir dire* list. The Assistant State's Attorneys interviewed the witnesses and were unable to determine what, if any, knowledge the three had relevant to appellant's defense. As a result, the trial court screened the testimony of the three witnesses out of the jury's presence.

At the outset, we note that neither the trial judge nor the prosecutors "forced" appellant's trial counsel to proffer what these witnesses would say on the witness stand. In fact, counsel agreed to an *in camera* screening of the witnesses. The lower court had good reason to question these witnesses. It was necessary to determine whether any of the witnesses would incriminate themselves in unrelated crimes. It was also essential to ascertain whether the witnesses would provide relevant testimony.

In the end, appellant called two of the three witnesses to testify. These witnesses stated that State witness Lindsay Blackwell used heroin and smoked marijuana. Thus, appellant was afforded the opportunity to impeach an important State witness and suffered no prejudice from the screening procedures used by the trial judge.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.