478 A.2d 326

**Charles WATKINS**

v.

**STATE of Maryland.**

**No. 1639, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

July 17, 1984.

706

W. Anthony Fitch, Washington, D.C., with whom was Kenneth M. Robinson, Washington, D.C., on the brief, for appellant.

Richard E. Israel, Asst. Atty. Gen., with whom was Stephen H. Sachs, Atty. Gen. of Maryland, on the brief, for appellee.

Argued before WILNER, GARRITY and BELL, JJ.

WILNER, Judge.

Appellant was convicted by a jury in the Circuit Court for Prince George's County of second degree murder, false imprisonment, and use of a handgun in the commission of a crime of violence. Upon these convictions, he was given consecutive prison sentences of 30 years, 10 years, and 15 years, respectively. In this appeal, he makes the following five complaints:

"I. The trial court's failure to conduct an adequate inquiry into appellant's pretrial claim of ineffective assistance deprived appellant of the right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

II. The court below erroneously admitted defendant's statements into evidence when those statements had been obtained from him through trickery and artifice and in violation of an agreement between his attorney and the prosecutor that was not superceded by a waiver of his *Miranda* rights.

III. The court should have granted appellant's motion to strike the testimony of the two State's witnesses who twice violated the rule on witnesses and did so, in one of those instances, at the behest of the Assistant State's Attorney.

IV. The court below erred in denying appellant's motion for a judgment of acquittal on the false imprisonment count because the State adduced no evidence from which a reasonable juror could conclude that Harris had been imprisoned or detained against his will at any time.

V. The trial court committed plain error when it failed anywhere in its final instructions to provide the jury with any guidance whatsoever on the critical evidentiary issues in the case."

As we find no reversible error, we shall affirm.

The charges against appellant arose from the execution-like, drug-related slaying of one Eddie Harris on June 23, 1981. The *dramatis personae* are appellant, the victim Harris, Darren Brigman, and Ronnie Wilder, all of whom were involved in the trafficking of heroin, and Detective John San Felice, who interrogated appellant on three occasions. The evidence showed that on the day of the murder, appellant met Harris at a schoolyard in the District of Columbia, persuaded Harris to accompany him to test some drugs, drove with him, Brigman, and Wilder in Brigman's car into Maryland, led him into a wooded area, and shot him five times.

The motive, as asserted by the State, was a bit complex. Some six months before the killing, appellant had been given an ounce of pure heroin on consignment to cut and bag for street sale. The street value of the heroin was about $25,000. Appellant had Brigman and Wilder dilute and bag the heroin, which appellant then apparently sold. Due to his own financial difficulties, however, appellant was unable to pay his supplier; he spent the money earned from the resale without paying for the cost of the goods sold.

As a defense to the imposition of the supplier's anticipated collection efforts, appellant desired to convince the supplier that Harris had stolen the money from Brigman. Somehow, the episode of June 23, was part of that endeavor.

Most of the damaging evidence against appellant came from Brigman, Wilder, and San Felice.

### (1) *Assistance of Counsel*

Although the crimes charged to appellant occurred in June, 1981, he was not indicted until December, 1982. Counsel, in the person of William G. Parker, Jr., entered his appearance on March 2, 1983. He was privately retained and represented appellant throughout the six-month pre-trial period (trial commenced September 26, 1983).

On September 22—four days before trial—appellant wrote to the court clerk, complaining that Mr. Parker "does not have my best interest at heart", that their relationship "is suffering a constant conflict of interest", and that "he has destroyed my confidence in his desire to render me adequate assistance of counsel." He complained in particular that Parker had "refused to inform me of all the evidence against me and will not enlighten me regarding the extent of his pre-trial preparations." He stated that counsel had urged him to "plead guilty to charges I am not guilty of." He asked that Parker be removed from the case, asserting that "this is not a delay tactic, but an attempt to salvage my 6th and 14th amendment rights."

On the morning of trial, just after the jury was sworn, appellant repeated his request that Mr. Parker be discharged, and asked that a public defender be appointed in his place. In support of that motion, he told the court:

"Your Honor, the following list of circumstances surely demonstrates Mr. Parker's deliberate abdication of his ethical and legal duty to faithfully represent me in this matter. Mr. Parker has not confided in me regarding one iota of the pretrial preparations, leaving me to think there has been no investigation of my case by Mr. Parker

whatsoever. There has been no witness conference. I have only been shown a very very small portion of the discovery evidence. Mr. Parker has not interviewed State's witnesses. If he has any information in this regard, he has refused to inform me of it. My parents are angry and disgusted with Mr. Parker's conduct and lack of progress. Mr. Parker's attitude toward both my parents and myself has been totally unprofessional. Mr. Parker has adopted an attitude of negativity with me because I do not have information, names, dates, et cetera, that he says I should know. Mr. Parker has constantly pressed me to testify for the government in the case regarding things I know nothing of and he has insisted I help the State's Attorney in another prosecution I know nothing about. His advice to me thus far is to take a plea to twenty-five years on a charge I am not guilty of and to cooperate with the government. My parents have paid Mr. Parker from their meager savings and he has taken advantage of all of us."

In response, counsel pointed out that he had been representing appellant for two years, that he had been to see appellant "on immeasurable instances", and had made his office available to appellant's parents at least once a week. The problem, he said, was that he got no cooperation from appellant. Specifically:

"I have asked Mr. Watkins to furnish me with a list of witnesses. He has only given me one. That individual has been summoned. I have asked Mr. Watkins to give me places and names of individuals who could say where he was on the day the instances took place. He has failed to do so. I have asked him to give me any information which would be beneficial to me in planning his defense. He has failed to do that. I wrote him a letter, which I believe is part of the Court jacket, copy to Your Honor, copy to his parents, which said that I would come over and see him on the 13th day of September and if he didn't have information then for me in order to prepare his defense, I would ask to withdraw from the case. When I

went over to see him, he furnished me with certain information, which he said I could prove by way of the polygraph examination.

With the assistance of Mr. David Simpson, who I have been in contact with in this case, we took Mr. Watkins to the Prince George's County Police Department, where he took a polygraph examination, which showed he was deceptive on almost every question, especially the information he gave me relative to preparing his defense. I have gone over with Mr. Watkins in detail the State's case. I have not only shown him, but his parents, all the statements which have been given and his parents, as a matter of fact, have a copy of all the statements that have been given by the State's witnesses to Mr. Simpson and to the Police Department.

Your Honor, as best I could, with no cooperation from Mr. Watkins, I believe I have amply prepared his defense. I'd also add that Mr. Watkins has constantly given his parents one bit of information, while he has made certain statements to me which may make him or may not make him culpable of certain offenses, which I certainly couldn't talk to anyone about, including his parents, because of attorney-client privilege. He's aware of that and constantly has been using his parents as a wedge between he and I."

The prosecutor, Mr. Simpson, stated that he had provided "open file" discovery to Mr. Parker, and that Mr. Parker "has everything that I have." He said that Mr. Parker had been in contact with him "on a three times a week basis", and that he had been given "copies of statements and reports that I wouldn't even normally do as far as utilizing our own facilities." He confirmed that Mr. Parker was instrumental in persuading him to give appellant a polygraph examination, "which I don't normally do," because "Mr. Parker convinced me that perhaps because of things he found out, it might shed some further light in this case". Continuing "[t]he State went through quite a bit of trouble

and expense to have the Defendant administered the lie detector test, which he flunked miserably."

Finally, the court was informed that counsel had spoken with all of the "civilian witnesses," but that there were two witnesses who were inmates in institutions outside of Maryland that neither the prosecutor nor Mr. Parker had interviewed. The reference, apparently, was to Brigman and Wilder, who had been mentioned extensively in the statements appellant had given to the police, which statements were, of course, given to Mr. Parker.

Upon this record, the court concluded:

"Well, Mr. Watkins, sometimes people ask for a change of attorney in order to get a delay of the trial. The only basis for striking the appearance of your attorney is whether or not he has been ineffective. And in this case, from looking at the Court jackets, listening to both of the attorneys tell me what has happened in the past, there is absolutely no question in the Court's mind that Mr. Parker has been effective, most effective.

Now, the Constitution says you are entitled to effective representation of the Defense lawyer. You don't have to like him, you don't have to love him. The law does not require that. The law requires he give you effective representation and everything I have seen so far, Mr. Parker has acted with speed, he has acted with diligence and he has tried to prepare this case as best he can and he's done everything that the law would require him and the Canons of Ethics would require him to do."

Appellant now complains of the "trial court's failure to conduct an adequate inquiry into appellant's pretrial claim of ineffectiveness." Recognizing that claims of ineffectiveness of counsel are normally left to post-conviction proceedings, he nonetheless asks us to follow the lead of the District of Columbia Court of Appeals in *Monroe v. United States,* 389 A.2d 811 (D.C.) *cert. den.* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), and direct that such claims be addressed preliminarily by the trial court when based on

*pre-trial* lapses—inadequate preparation, lack of communication, and the like.

 We have no particular difficulty with a trial court addressing and resolving such a claim before trial if that can be done efficiently, effectively, without undue prejudice to the defendant, and without undue strain upon the attorney-client relationship. As the *Monroe* court pointed out, 389 A.2d at 818, the "assertion of a pretrial claim of ineffectiveness presents the trial judge with the opportunity to take steps to eliminate any deficiencies in the representation of counsel before the resources of the judicial system have been invested in a full-blown trial."

We do not believe, however, as the *Monroe* court did, that the trial courts have a "constitutional duty" to conduct a specific evidentiary-type inquiry "whenever they are confronted with those types of allegations." *Id.* 821. Indeed, there may well be circumstances when it would be inappropriate for the court to do so. Complaints such as this necessarily pit lawyer against client; they may require the disclosure of confidential communications, other facts or statements inadmissible in evidence, and attorney work-product, thought processes, and tactical decisions, some or all of which could be very harmful to the defendant if disclosed in advance of trial. All of these things, as well as the amount and effect of the attendant delay in the trial itself, must be taken into account in deciding whether and how to address a complaint about ineffective assistance of counsel at that preliminary stage.

 Here, we think that the court *did* make the inquiry now sought by appellant. It listened to his complaint and to the response. Nothing more was asked of it; no further evidence was proffered by anyone. It had all the information it needed to determine whether appellant's allegations were true and whether his complaints were valid. It decided that they were not, and upon this record, we cannot conclude that it erred in so finding. This would especially be true under the standards for determining the issue

announced by the United States Supreme Court in *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which, we note, are somewhat tighter than those applied by the D.C. Court in *Monroe*.

## (2) *Appellant's Inculpatory Statements*

Appellant made four statements that were admitted into evidence. In this appeal, he complains about three of them.

The first statement was an oral one given to Detective San Felice on October 28, 1981. Appellant had been arrested by District of Columbia police officers and taken to a station-house in the District. San Felice, who went to the station-house ostensibly to serve appellant with the Maryland warrant issued in this case, interviewed him there. He advised appellant of the charge and read him his various rights. Initially, appellant told San Felice that he was not involved in Harris' murder. He said that he had seen Harris on June 23 at the school playground, that Harris had a gun, that appellant was afraid that Harris intended to rob him, and that he ran away. He knew nothing of the murder.

San Felice then told appellant, falsely, that he (San Felice) had spoken with Darren Brigman and one Alonzo Fields, and that they had implicated him in the murder. At that point, according to San Felice, appellant changed his story; he accused Brigman and Fields of having committed the murder, and asserted that "it was in relation to Harris having set up [Brigman] to be robbed of some drugs and some jewelry . . . ." He further stated that Fields and Brigman "were stupid because they had taken Harris away from the playground in front of a crowd." Appellant refused to put his statement in writing. He told San Felice that a few months earlier, he had given a written statement to the police on another matter and had been hurt by doing so.

Two days later, San Felice returned to the District, took custody of appellant, and drove him back to a Prince

George's County police station. He was again advised of his various rights, and initially he declined to say anything. Later that afternoon, however, after being told of his rights twice more, he confirmed, with some greater elaboration, what he had told San Felice on the 28th—that Brigman and Fields had killed Harris. He told San Felice that they lured Harris from the playground on the pretext that they wanted to "test some drugs", that the gun they used belonged to Fields' father, and that he (appellant) "was present when a contract was placed on Mr. Harris for allegedly setting up a drug robbery." Once again, he refused to put his statement in writing.

The third statement, to which no complaint is made here, was a written one given by appellant to Brigman in March, 1982. The two men were then in the county detention center. Brigman learned that appellant had implicated him in the murder and confronted appellant. At Brigman's urging, appellant wrote a letter in which he exculpated Brigman and inculpated himself.

The fourth statement came about in connection with the polygraph examination requested by appellant. The parties, according to appellant, agreed in advance that no statement made "during the polygraph examination" would be used in evidence. A waiver of rights form was signed. While preparing for the test, which was conducted at the police station, Detective San Felice explained to appellant how the polygraph worked, went through "some background information with him", noted that he had made several different statements, and asked what his current position was on the matter. This, he said, was to enable him to frame the appropriate questions for the polygraph examination. Defense counsel, at the time, was at the police station waiting in the hallway; he had earlier conferred with appellant. In response to San Felice's question, appellant, though still denying that he shot Harris, admitted that he was in the car and accompanied Harris, Brigman, and Wilder from the playground to the *locus delicti*. This

time, he intimated that Wilder and possibly another individual named Timothy Hampton had shot Harris.

Appellant attacks the first statement given to Detective San Felice on the ground of involuntariness. He claims that he was "off balance" at the time, that he was suffering from confusion and emotional distress following the revelation that he had been accused of murder which, when coupled with San Felice's particular deception, overwhelmed him. His challenge to the second statement is an extension of his challenge to the first: the one proceeded from the other and thus is suppressible as poisoned fruit. The fourth statement, he argues, is bad because it was without benefit of *Miranda* warnings. The waiver and agreement that he signed, he argues, applied only to statements made during the polygraph examination, and not to any preliminary statements.

██ Upon the record in this case, appellant's arguments are patently without merit. As we pointed out in *Hopkins v. State,* 19 Md.App. 414, 424, 311 A.2d 483 (1973), *cert. den.* 271 Md. 738 (1974), relying upon *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), "the mere fact that the accused was motivated to make an inculpatory statement in reliance upon the officer's deceit does not render the accused's statement inadmissible or involuntary." Deceit, we said, was not precluded as a "valid weapon of the police arsenal." *Id. See also Lewis v. State,* 285 Md. 705, 721–22, 404 A.2d 1073 (1979); within limits, "[a] degree of police deception to obtain a confession is tolerated." The limits alluded to in *Lewis* were not exceeded in this case. We therefore find no error in the admission of the first and second statements.

██ The fourth statement, preliminary to the polygraph examination, was made after appellant had been given his *Miranda* warnings and had, in writing, waived his right of silence. There is nothing to suggest that it was involuntary. Appellant's argument that it somehow fell within the ambit of the "agreement" not to use statements made

"during the polygraph examination" is not borne out by the record, and is not compelled as a matter of law.

(3) *Sequestration—Motion to Strike Testimony of Brigman and Wilder*

At the commencement of trial, the court, at appellant's request, asked "all witnesses who are present in the courtroom to testify in this case [to] please step outside of the courtroom and remain until your name is called. Do not discuss your testimony with each other or anyone else." Among the witnesses scheduled to testify were Brigman and Wilder, but neither of them was in the courtroom at the time. Brigman was an inmate at the Lorton Reformatory in Virginia; Wilder had been incarcerated at an Alabama prison. Both had been brought in for the trial and, at the prosecutor's request, were placed for a time in the same holding cell at the courthouse. The prosecutor freely admitted that he initially put the two together in the hope that Wilder would convince Brigman to testify. Brigman had spoken with the prosecutor on one earlier occasion but had been uncooperative. Wilder told Brigman what he (Wilder) intended to say.

This information surfaced when Brigman was called to testify. Appellant moved to strike—actually to suppress—Brigman's testimony; the motion was denied.

At the conclusion of Brigman's testimony, the court took a ten minute recess. Wilder was the next witness. He stated that he and Brigman not only shared a cell prior to Brigman's testimony, but that Brigman was returned to that same cell after his court appearance. When that was brought to light, Wilder was examined, on *voir dire*, about what Brigman had told him. According to Wilder, Brigman related some of the areas inquired about on direct and cross-examination. He mentioned in particular the examination concerning the "cutting" of drugs, although Wilder said that "[i]t went in one ear and went out the other." Appellant moved to strike (*i.e.*, suppress) Wilder's testimony.

The prosecutor acknowledged that he had neglected to inform Brigman and Wilder of the sequestration order. He pleaded, however, that because of overcrowding in the holding cells and the extremely tight security surrounding the trial, "it was forced on us to keep them there." The court permitted Wilder to testify generally, but precluded any testimony concerning the particular areas mentioned to him by Brigman. It explained:

"I think the record should reflect, to begin with, this trial has been covered by a great deal of intense security. Members of the SWAT Team from the Sheriff's Department, some half dozen, at least, and special precautions in the courtroom and there have been very difficult times in arranging transportation of witnesses from other institutions. There have, according to my information, been certain threats, overt and veiled upon certain participants in this particular trial. I feel, however, that Mr. Wilder should not be permitted to testify about any of the dope cutting business or any of these people's names that keep getting mentioned."

Appellant claims now that the court failed to conduct "an inquiry into the substance and content of the discussions between the two witnesses", which simply is not true, and that it abused its discretion in declining to strike the testimony of both Wilder and Brigman.

The sequestration of witnesses was governed at time of trial by Maryland Rule 755,[1] which directed the court, upon request, to order "that a witness be excluded from the courtroom until called upon to testify", and permitted the court to direct people "present in the courtroom" not to disclose the nature of evidence introduced "to any witness who is excluded under this Rule." Section d of the Rule permitted the court to exclude all or part of the testimony

---

1. By virtue of the recent revision and recodification of the Maryland Rules, effective July 1, 1984, the sequestration rule appears as Rule 4–321. No substantial change seems to have been made in the new rule.

of a witness "to whom a disclosure has been made contrary to the order."

The "essential purpose" of the sequestration Rule, we said in *Hurley v. State*, 6 Md.App. 348, 351–52, 251 A.2d 241, *cert. den.* 255 Md. 742 (1969), "is to prevent one prospective witness from being taught *by hearing another's testimony;* its application avoids an artificial harmony of testimony that prevents the trier of fact from truly weighing all the testimony; it may also avoid the outright manufacture of testimony." (Emphasis supplied). *See also Bulluck v. State*, 219 Md. 67, 70–71, 148 A.2d 433, *cert. den.* 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 85 (1959); *Nickerson v. State*, 22 Md.App. 660, 325 A.2d 149, *cert. den.* 273 Md. 722 (1974). There is nothing inappropriate, it seems to us, in prospective witnesses discussing the case among themselves, or even relating, one to another, what each proposes to say, *prior to any of them actually testifying.* What the Rule seeks to avoid is a prospective witness learning what another witness has, in fact, said—what, in fact, has occurred in the courtroom. Accordingly, although the initial placing of Brigman and Wilder together may have seemed to the trial court to be a constructive violation of the Rule, or of its sequestration order, in fact it was not.

The second conversation between the two witnesses, however, clearly was in contravention of the Rule and the order, and the State was incredibly remiss in permitting that to occur. But, as the Court said in *Brown v. State*, 272 Md. 450, 477–78, 325 A.2d 557 (1974):

"It is within the sound discretion of the trial court to determine whether or not the testimony of a witness who has violated a rule of sequestration is admissible or should be excluded.... The complete exclusion of the testimony of witnesses for a violation of the sequestration rule is not lightly to be imposed as a penalty even upon an offending party."

Upon the record in this case, we find no abuse of discretion in what the court did. It enforced the Rule by

excluding testimony from Wilder in those areas in which he actually had been informed about Brigman's testimony. There was no compelling cause to exclude him entirely as a witness.

### (4) *False Imprisonment*

The issue here is one of first impression in Maryland. Appellant's conviction for false imprisonment arose entirely from the enticement of Harris into Brigman's car and his subsequent "confinement" during the trip into Maryland, presumably up to the time he was shot. There was no evidence that any force, or threat of force, was ever applied against Harris prior to the actual shooting. Indeed, the uncontradicted evidence was that he voluntarily accompanied appellant under the mistaken notion that they were going to test some drugs. The false imprisonment, in other words, rested entirely upon the element of deceit, and therein lies the issue. Is the crime of false imprisonment committed when the detention or confinement is achieved solely by deception, and not by actual force or threat of force?[2]

Both sides concede that there is no Maryland authority on this question;[3] in fact, no direct authority of any kind is cited to us by either party. Rather, they each examine the issue by analogy to the related crime of kidnapping, which

---

2. The issue was raised *sub silentio* in the form of appellant's motion for judgment of acquittal. Counsel sought to argue the grounds for his motion but was prevented from doing so by the court. Thereafter, the court instructed the jury that the element of detention could be achieved by threats, by force, or "by deceit." Appellant did not except to that instruction, and so we have no occasion to review it in this appeal. Maryland Rules 757, 1085. But the question of whether the evidence sufficed to permit the very submission of that count to the jury clearly was preserved; *that* is what we shall review.

3. Ginsberg, *Criminal Law and Procedure,* p. 142, in discussing the elements of false imprisonment, says that "it is settled that the detention may be the result of fraud or fear." He is certainly correct as to the latter-fear-but the former is not at all settled, and none of the cases cited by Mr. Ginsberg for that proposition support it.

has been regarded as an "aggravated form of false imprisonment." *Midgett v. State,* 216 Md. 26, 38, 139 A.2d 209 (1958).

The parties agree that kidnapping and false imprisonment were common law crimes, that false imprisonment remains a common law offense in Maryland, that kidnapping was made a statutory crime in Maryland in 1809 (Md. Laws, 1809, ch. 138), that it remains a statutory crime today (Md.Code, art. art. 27, § 337), and that the codification of kidnapping did not serve to abolish the crime of false imprisonment or the distinction between the two crimes. *Midgett v. State, supra,* 216 Md. 26, 139 A.2d 209. They also recognize that under the kidnapping *statute,* a kidnapping may be accomplished by fraud. See § 337. Where they differ is in their perception of the common law crime of kidnapping.

Relying, inappropriately we think, on *Tate and Hall v. State,* 32 Md.App. 613, 615, 363 A.2d 622, *cert. den.* 278 Md. 723, 736 (1976), the State contends that common law kidnapping could be accomplished by a fraudulent taking. From that, it argues that, as the only distinction between the two crimes is the additional element of asportation required for a kidnapping, it follows that false imprisonment may also be achieved by a fraudulent or deceitful detention. Appellant, on the other hand, maintains that it is only by reason of the statute that a kidnapping can be based on a taking induced by fraud—that common law kidnapping required actual force or threat of force. Accordingly, he says, as the definition of common law false imprisonment must be by reference to the common law form of kidnapping, it is clear that false imprisonment cannot come about by a detention induced solely by deceit.

In the absence of any direct authority on the point at issue—whether false imprisonment can arise from a detention achieved solely by deceit—the analogy to common law kidnapping is, we think, an entirely appropriate one. Thus,

the question comes down to whether common law kidnapping could be based upon an initial taking induced by fraud.

*Tate and Hall, supra,* relied upon by the State, does no more than pose the question. At p. 616 of 32 Md.App., 363 A.2d 622, we noted that, although a fraudulent carrying does constitute a kidnapping under the *statute* (§ 337), "[a]mong common law authorities there was some dispute as to whether a carrying with consent, fraudulently obtained, constituted kidnapping." That is hardly precedent for one view or the other.

Whatever the actual rule was in England prior to 1776— and it really is not clear from the various treatises—the modern view in the United States, at least among the few courts that have considered the question, seems to be that common law kidnapping *may* rest upon a fraudulent taking. *See State v. Murphy,* 280 N.C. 1, 184 S.E.2d 845 (1971); *State v. Gough,* 257 N.C. 348, 126 S.E.2d 118 (N.C., 1962); *State v. Brown,* 181 Kan. 375, 312 P.2d 832 (1957); and *cf. People v. DeLeon,* 109 N.Y. 226, 16 N.E. 46 (1888); *Kent v. Commonwealth,* 165 Va. 840, 183 S.E. 177 (1936); *People v. Siegal,* 362 Ill. 389, 200 N.E. 72 (1935); *State v. Walker,* 139 Mont. 276, 362 P.2d 548 (1961). *See also* Anno., *Kidnapping By Fraud Or False Pretenses,* 95 A.L.R.2d 450, 451:

"The few authorities which have considered the issue have reached the conclusion that at common law the use of physical force was not necessary to constitute the crime of kidnapping, and that it is possible to base a prosecution upon an unlawful taking or detention effected by fraud or false representations."

The theory underlying this principle is the obvious one— that "where false and fraudulent representations amounting substantially to a coercion of the will of the victim are used in lieu of force in effecting kidnapping, there is in law no consent at all on the part of the victim. Under those circumstances the law considers fraud the equivalent of force." *State v. Murphy, supra,* 184 S.E.2d at 848.

This view is certainly not inconsistent with anything that the Maryland appellate courts have said on the subject; nor is it precluded by the fact that the 1809 General Assembly, in codifying the crime, chose expressly to include the element of fraud. That could as easily have been for purposes of clarification as to denote a change in the law.

Upon this analysis, we conclude that the Maryland common law crime of kidnapping—that which existed from 1776 to 1809—proscribed both the forceful and the fraudulent taking of a person, and that, as the relevant distinction between that crime and false imprisonment involves only the element of asportation, false imprisonment may also be achieved through fraud. As appellant's challenge to that conviction in this appeal rests solely on whether it can rest upon a fraudulent taking, and does not question whether the evidence sufficed to sustain a finding of fraud, we shall not consider that matter. For the reasons stated, the false imprisonment conviction will be affirmed.

(5) *Instructions On Credibility*

Finally, appellant complains of the court's omission to give an instruction "pertaining to any of the critical, interrelated evidentiary issues in the trial." No such instruction was requested. We therefore decline to consider the issue. Maryland Rules 757, 1085.

JUDGMENTS AFFIRMED.

APPELLANT TO PAY THE COSTS.