490 A.2d 728

**Larry Daniel BRATT**

**v.**

**STATE of Maryland.**

**No. 1021, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

April 10, 1985.

536

Clarence W. Sharp, Assigned Public Defender of Annapolis (Alan H. Murrell, Public Defender on the brief of Baltimore), for appellant.

Valerie J. Smith, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., both of Baltimore, Warren B. Duckett, Jr., State's Atty. for Anne Arundel County and Gerald K.

Anders, Deputy State's Atty. for Anne Arundel County on the brief, both of Annapolis), for appellee.

Argued before MOYLAN, BLOOM and GETTY, JJ.

GETTY, Judge.

Larry Daniel Bratt, the appellant herein, was convicted by a jury in the Circuit Court for Anne Arundel County of murdering John W. Carback and Donna Carback on December 19, 1981. Trial of the case began August 2, 1983 and concluded on August 8th, at which time appellant was sentenced by the court (Thieme, J.) to consecutive terms of life imprisonment.

Appellant raises four issues for our determination, namely:

1. Did the trial court err in denying appellant's motion to suppress evidence?

2. Did the trial court err in admitting evidence of another alleged crime by appellant and the alleged complicity in that crime by his mother?

3. Did the trial court err in permitting cross-examination of appellant's mother beyond the scope of her direct testimony?

4. Whether appellant was denied the effective assistance of counsel?

We decline to address the fourth issue other than to state that it is more appropriately addressed in a post conviction proceeding where defense counsel has an opportunity to explain the challenged acts or omissions. *See Johnson v. State*, 292 Md. 405, 439 A.2d 542 (1982).

### Facts

The bodies of John Carback and his wife Donna were discovered at their home in Lake Shore on Monday, December 21, 1981. Each of the victims had been shot three times and Donna sustained a broken jaw and stab wounds in addition to the gunshots. None of the sophisticated alarm

systems in the home had been activated. The police recovered a number of .45 caliber slugs at the scene plus fourteen guns, a small quantity of cocaine and 48 pounds of marijuana. Fingerprints on a beer can at the scene were identified as belonging to one Tony Raspa who was separately indicted and acquitted of the Carback murders. Appellant has not raised any argument as to the sufficiency of the evidence upon which he was convicted. We shall, therefore, relate other facts as they pertain to the issues raised.

### Search of the Townhouse

In the course of their investigation the police focused upon a townhouse in Glen Burnie formerly occupied by appellant. On August 26, 1982, two police officers went to the premises and obtained the consent of the tenant, Jeanine Diehl, to conduct a search of the premises. Diehl had rented the apartment and furnishings from the owner, Mike Lohr, five months earlier.

Initially, the police were interested in examining several bullet holes in the walls. Upon learning that several cardboard boxes in the basement had been left there by appellant, the police examined the contents of the boxes and recovered a receipt for a MAC–10 machine gun appellant had purchased in Georgia, a picture of John Carback and a photograph of Thomas Raspa. The basement consisted of one large open room that was not sealed off or locked in any manner.

Diehl received a phone call from appellant approximately one month before the police arrived. Appellant advised her he was coming to get the furniture, but did not do so. No mention was made as to the boxes in the basement. The furniture was also claimed by appellant's girl friend, Cynell Crabtree, who advised Diehl several days after Diehl rented the apartment that appellant had given her the furniture. The third claimant was the landlord, Lohr, who told Diehl that he bought the furniture from appellant.

Crabtree testified that she lived with appellant in the townhouse from April, 1981, until January, 1982, when he left for Georgia on a business trip. He never returned and Crabtree left the premises two months later. The next tenant was Diehl.

Appellant contends that the warrantless search of the cardboard boxes cannot be justified under the theory of abandonment or consent. We disagree. Diehl had exclusive control over the premises that she rented from Lohr. Under these circumstances, she had full authority to consent to the search of the entire premises.

In *Tate and Hall v. State*, 32 Md.App. 613, 363 A.2d 622 (1976), two defendants were tried for rape and kidnapping. The mother of one of the defendants consented to the search of her son's bedroom from which the police recovered a wallet belonging to one of the victims. In upholding the search we said that the critical question was whether the defendant's mother

"... possessed common authority over or other sufficient relationship to the premises as to authorize her consent."

*Accord, Jones v. State*, 13 Md.App. 309, 283 A.2d 184 (1971), *cert. denied*, 264 Md. 749 (1972). We hold that Diehl's control over the entire premises warranted her consent to search unsealed boxes in the open basement.

Appellant left the premises and the state almost five months before the search. That he had no intention to return is evident from his girl friend's testimony that he failed to return from a business trip to Georgia and, after a two month interval, she left the townhouse and moved to California. Appellant's phone call concerning the furniture does not establish any expectation of privacy as to the boxes which he did not mention.

"Abandoned property does not fall within that category in which one has a legitimate expectation of privacy to bring it within the protection of the Fourth Amendment." *Duncan & Smith v. State*, 281 Md. 247, 378 A.2d 1108 (1977); *accord, Everhart v. State*, 274 Md. 459, 337 A.2d

100 (1975). Whether property is abandoned is a question of fact based upon the act and intent. *Everhart, supra.* We hold that the trial court did not err in deciding that appellant abandoned the property left in the basement for five months after his departure.

## M10 Automatic Pistol

■ Appellant was enrolled in a school for bodyguards in Georgia during 1980. At that time he purchased an Ingram M10 .45 caliber semi-automatic pistol, serial no. SAP45374. Several months after the two murders, appellant's employer, Bernard Dervan, became concerned over appellant's possession of this illegal weapon. His concern mounted following a heated argument between appellant and co-employee John Pastis, during which each threatened to kill the other. Appellant was advised to take a trip to Florida and Dervan removed the gun and three silencers from the apartment the two shared in Atlanta.

Dervan's brother told him that he had been in contact with a federal officer who assured him that if the gun was turned in no charges would be filed against anyone. Acting upon this advice, Dervan gave the gun to his brother and Pastis and they turned it in to the federal agents. The gun was ultimately acquired by the Anne Arundel County Police. At trial, an agent of the FBI testified that he compared the projectiles recovered from the crime scene with test firings he performed using each of the silencers. His conclusion was that two of the projectiles recovered at the crime scene came from the gun and one of the silencers to the exclusion of any other gun or silencer in the world.

Appellant argues that Dervan believed Pastis to be a federal agent and, therefore, the governmental action was sufficient to invoke the exclusionary rule as to evidence seized in violation of the Fourth Amendment. We see it differently. In *Herbert v. State,* 10 Md.App. 279, 269 A.2d 430 (1970), we said:

"We believe that by history, judicial rule and application, the exclusionary rule as to evidence seized in violation of the Fourth Amendment comes into play only when the evidence is obtained by governmental action. Whatever wrong is done by the act of one individual in taking the property of another, it is no invasion of the security afforded by the Fourth Amendment against unreasonable searches and seizures. *Burdeau v. McDowell,* (256 U.S. 465) at 475 [41 S.Ct. 574 at 65 L.Ed. 1048]. When an individual obtains incriminatory matter from an accused, no matter how improperly, and such matter comes into the possession of the government without a violation of the accused's rights by governmental authority, the exclusionary rule does not prohibit its use at trial.

\* \* \* \* \* \*

Each case must be judged on its own particular facts as to whether or not governmental action played such a part in the seizure of challenged evidence so as to invoke the Fourth Amendment."

*Accord, Bowers v. State,* 298 Md. 115, 468 A.2d 101 (1983); *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed.2d 1084 (1921).

The court made the following findings of fact regarding Bernard Dervan's testimony:

"throughout the course of Mr. Dervan's testimony, he repeatedly stated his concern for the Defendant's well-being, and that concern prompted him to act as he did. Mr. Dervan's testimony indicated that he had, at best, tenuous relations with a man [Pastis] about whose identity he was unsure. The Court finds that, although this man may have in fact been a government agent, his shadowy presence did not affect Mr. Dervan's decision to seize Defendant's gun, nor did this man direct Mr. Dervan to seize the gun, both of which occurred prior to the entry of any government agent. Rather, the Court finds that Mr. Dervan was acting as a private citizen in an effort to protect his friend, thus the seizure was neither the result

of governmental intrusion nor protected by the Fourth Amendment." [1]

We hold that the actions of Bernard Dervan were those of a private citizen; the Fourth Amendment is not involved.

## Other Crimes

Linda McCrowski testified that appellant told her in 1980 that he had to get rid of the Carbacks, because he and John Carback intended to commit murder in 1979 relating to a cocaine deal. Carback backed out of the plan and appellant stabbed the victim to death and enlisted his mother's help in disposing of the body. Donna Carback was told about the murder by her husband and that knowledge, according to McCrowski's testimony, required that she share her husband's fate. [2]

■ The general rule is set forth in *Martin v. State,* 40 Md.App. 248, 389 A.2d 1374 (1978).

> "The law of this State is fully in accord with the universally accepted rule 'that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible.' *Ross v. State,* 276 Md. 664, 669 [350 A.2d 680] (1976)."

The reasons for the exclusion of other crimes' evidence include latent hostility toward the defendant by the jury and the inference of a criminal disposition on the part of the accused.

■ The exclusionary rule does not apply where the evidence is substantially relevant to an issue before the

---

1. John Pastis testified at trial. He had been an informer for the Drug Administration several times. There was no evidence that he was a government agent with reference to the M10 pistol.

2. Linda McCrowski also testified that she informed the Anne Arundel Police in April, 1980, that appellant intended to kill the Carbacks.

court. Evidence of other crimes is admissible if probative of:

1. Motive to commit the crime charged;
2. The necessary mental state or intent required for conviction;
3. Absence of mistake;
4. A common scheme or plan relating to two or more crimes;
5. The identity of the accused.

*Worthen v. State,* 42 Md.App. 20, 399 A.2d 272 (1979); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980).

Appellant's admission to McCrowski explained a motive for the murder of John and Donna Carback. Additionally, McCrowski's testimony corroborated State's witness Wade Lane who recounted a conversation in which appellant stated he wanted two people killed and showed Lane photographs of a man and woman in their early thirties. Lane declined to participate, but gave appellant the name of Joe Bill Rowe who allegedly paid Lane a five hundred dollar "finder's fee." Lane, at appellant's request, flew from Texas to Baltimore and converted the M10 pistol from semi-automatic to full automatic. Lane said he was at appellant's apartment the night of the murder and that Rowe and Raspa left to "make the hit." Appellant left with his girl friend at about the same time. When the two men returned after 9:30 p.m., Rowe had a bullet wound in a finger of his right hand. Appellant, who returned alone, and Raspa, according to Lane, went back to the scene to retrieve a bag of cocaine. When they returned, appellant showed Lane a bloody knife and said "my man here had to finish her off."

On these facts we think the evidence of the earlier crime was admissible in that it established a motive for the Carback murders and indicated a continuing scheme relating to appellant's drug activity as the common thread in all of the crimes committed. We point out, moreover, that this

issue has not been preserved. Appellant's counsel objected to the proffer of McCrowski's testimony as double hearsay. The proffer, as the court noted, was a declaration against penal interest. When the evidence was presented to the jury, no objection was made. Prejudice was not raised as a basis for exclusion. One objecting on specific grounds is bound thereby and will ordinarily be deemed to have waived other grounds not mentioned. *Von Lusch v. State,* 279 Md. 255, 368 A.2d 468 (1977); Md.Rule 1085.

## Impeachment

Appellant's mother, Daphne Bratt, testified that she did not participate with her son in the disposition of a murder victim in 1979. The purpose of this statement was to refute Linda McCrowski's assertion that appellant told her in 1980 that his mother, Daphne, helped him dispose of a murder victim's body after John Carback backed out of the murder scheme. No other questions were directed to Mrs. Bratt by appellant's counsel.

On cross-examination, the State's first question was "Mrs. Bratt, have you ever given your son any advice on how to be a murderer?" Her response was "no, I have not." At that juncture the State asked that a letter be marked for identification. Appellant's counsel objected citing a stipulation to the effect that the letter would not be used. The State responded that the agreement was that the letter would not be used in the State's case-in-chief, but since the witness denied counseling appellant regarding being a murderer, the contents of the letter would impeach her. A second objection to the letter was based upon no showing that the letter preceded the Carback murders. The objections were overruled.

The letter consists of three handwritten pages on yellow, legal sized paper. Other than the word "Wednesday," it is undated. In pertinent part, the letter says:

"As far as the hitter I would let them no (sic) that you want to advance in the family and not be a hitter forever let them no (sic) this right away after they come to see you.... I feel sure it will not be street crime and make this very clear to them that you don't want street crime.... They tell you the jobs they have and the one they want you to do. The pay again depent (sic) on the job the bigger the job the better the pay. I feel sure they will give you some kind of training before to make sure you can handle the job. The wife you chose (sic) you will have to make sure she will never talk and be able to handle herself.

When you talk to them tell them you would like to be an International hitter for specific jobs. See what they say and go from there...."

The letter concluded by advising appellant to burn the letter after reading it; good advice that went unheeded. Mrs. Bratt explained that the letter was written while appellant was in the military prior to 1978 and was her response to questions he had asked pertaining to covert military operations that he was being trained to perform. The witness denied any knowledge of the Mafia or that appellant was engaged in illegal activities apart from governmentally sanctioned espionage.

 Did the contents of the letter impeach Mrs. Bratt's testimony that she had never given appellant advice on how to be a murderer? Of course it did. Was the letter prejudicial? Of course it was. On appeal appellant raises for the first time that the cross-examination exceeded the scope of the direct examination and that the letter had a prejudicial impact. Neither objection was ever presented to the trial court and, therefore, the issue has not been preserved for review. Md.Rule 1085. We note, furthermore, that no objection was made when the State asked Mrs. Bratt if she advised her son about being a murderer. If at that time a proper objection had been made to a question

that exceeded the scope of direct examination and had the objection been overruled, we may have viewed the matter differently. That, however, is not the case.

Cross-examination of witnesses, and the relevancy thereof, is left to the discretion of the trial court. *Reese v. State,* 54 Md.App. 281, 458 A.2d 492 (1983). In *Mutyambizi v. State,* 33 Md.App. 55, 60, 363 A.2d 511 (1976) we said:

"That a witness may be cross-examined on such matters and facts as are likely to affect his credibility, test his memory or knowledge or the like, is a fundamental concept in our system of jurisprudence. *Kantor v. Ash,* 215 Md. 285 [137 A.2d 661 (1958)]; *Bryant v. State* 4 Md. App. 572 [244 A.2d 446 (1968)]. And cross-examination to impeach, diminish, or impair the credit of a witness is not confined to matters brought out on direct examination; it may include collateral matters not embraced in the direct examination to test credibility and veracity, it being proper to allow any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief...."

At argument, appellant, by letter, requested that we consider several issues not raised in his brief; namely, that Pastis was a government agent within the purview of the Fourth Amendment when he seized the M10 pistol and that the chain of custody of the three silencers was not established. We have reviewed the record as to each of these allegations and we hold that the trial court was not clearly erroneous in deciding that Dervan, appellant's employer, had already taken possession of the gun and three silencers before Pastis requested that he be given custody of the weapon and, further, that Dervan's reason for taking the weapon was for Bratt's protection. Md.Rule 1086.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.