574 A.2d 362

**Lenard Bernard OWENS**

v.

**STATE of Maryland.**

**No. 1563 Sept. Term, 1989.**

Court of Special Appeals of Maryland.

June 6, 1990.

Bradford C. Peabody, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Sarah E. Page, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and M. Kenneth Long, Jr., State's Atty. for Washington County, Hagerstown, on the brief), for appellee.

Submitted before WILNER, KARWACKI and CATHELL, JJ.

CATHELL, Judge.

Appellant, Lenard Bernard Owens, was convicted before a jury in the Circuit Court for Washington County (J. Corderman presiding), for possession of cocaine with intent to distribute. He was sentenced to 20 years imprisonment and a $10,000 fine. On appeal he presents a single issue:

Did the court below err in holding that Appellant had neither standing to contest a search of, nor a reasonable expectation of privacy in, a piece of luggage he placed in a friend's living room, temporarily? [1]

## The Facts

Appellant traveled, in late January and early February 1988, from his home in Florida to the Hagerstown area. He apparently first delivered the bag in question to "Miss Elizabeth's" house. It was not with him on the last day of

---

1. The hearing judge was Judge D. Moylan.

January 1988 when he spent the evening at Marla Gardin's house. According to Owens, at some point he asked Marla Gardin to take the bag in question from Miss Elizabeth's house to her house, which she did,[2] where it was placed in the living room. There it remained until the consensual search occurred.

Prior to trial, Judge D. Moylan held a suppression hearing in respect to the search. The relevant testimony of Marla Gardin at that hearing was as follows:

Q. Okay, and when he [Detective Sheppard] came, what, if anything, did he say to you?

A. He asked me if he could search my house and I told him yes.

*  *  *  *  *  *

Q. Did he show you a form, read a form to you about a Right to Consent?

A. Yeah.

*  *  *  *  *  *

Q. Did the officers ask you for permission to search those bags in particular?

A. Yes, they did.

Q. And what did you tell them?

A. They could.

*  *  *  *  *  *

A. One was searching bags and one was searching the house. It was all at the same time.

Detective Sheppard testified that:

A. I indicated to her that I had received information that there were drugs in her apartment that was brought there by four subjects who just arrived there that morning.

Q. And what, if anything, was her response?

---

2. Gardin did not admit to having transported to her home the bag in question.

A.   She stated that she had no problems with us coming in and searching the house.

\*      \*      \*      \*      \*      \*

Q.   And Detective, what, if anything, did she indicate to you about the persons arriving that day?

A.   After she signed the consent form, she pointed to some luggage which was located on the southwest corner of the living room and she stated "they had just brought it here this morning and if there's any drugs it would be in there."   ...

\*      \*      \*      \*      \*      \*

Q.   And as a result of the consent, did you then search those suitcases?

A.   Yes.

\*      \*      \*      \*      \*      \*

Q.   Do you recall anything she said about [the] intentions [of those leaving the bags]?

A.   Basically the only thing was that she told me that they had come to the apartment that morning and uh, after they had just arrived from Florida, and her response also was that they would come to her apartment when they would come to town to sell crack, oftentimes leaving some in her apartment, but oftentimes taking it out on the street with them.

Owens' relevant testimony was as follows:

Q.   Where was your luggage at that time?

A.   It was at Marla's house.

Q.   What were your intentions in regard to that luggage?

A.   Well, it doesn't really matter because I had two bags and I just wanted to get a[n] outfit to put on because I had that outfit on for a couple of days and I left.

Q.   Were you going to go back to pick it up?

A.   Well, later on whenever I had time to.

Q.   What did you tell Marla about it?

A. I asked her could I leave my luggage there till I come back and she said yes.

*     *     *     *     *     *

Q. Okay. Do you know how your luggage got from Miss Elizabeth's house to Marla Gardin's?

A. Yes.

Q. How?

A. Marla brought it over.

Q. At whose request?

A. I asked her to bring it over to where I could change clothes.[3]

*     *     *     *     *     *

Q. You said you had left and gone somewhere and at some point down the road you were going to come back and get the bag?

A. Yes.

Q. But you weren't sure when you were going to come back?

A. No.

## The Law

In cases of third-party consent, what is involved is the lack of a total expectation of privacy, the lack of absolute Fourth Amendment coverage, in the party against whom the consent ultimately operates *vis-a-vis* the spouse, co-tenant, or co-owner giving the consent. Some writers have referred to this situation as "an assumption of risk" on the part of each party sharing control with another party. There is always the risk that the other person enjoying equal privileges in the protected area may invite

---

**3.** Appellant apparently failed to inform Gardin that the bag he was asking her to transport contained 973 pieces of crack cocaine valued at $97,000 plus a substantial sum of cash.

guests, even including policemen, into the private zone. What is involved is the lack of full Fourth Amendment coverage as against the spouse or co-owner and his or her guests.

Gilbert & Moylan, *Maryland Criminal Law* 407–08, § 35.

■ While we have reviewed the authorities cited by both parties, we believe that the specific factual circumstances of this case bring it within the following line of cases, wherein consent searches generally, and third-party consent searches specifically, have been upheld as reasonable searches.

The tenant's adult daughter, Mrs. Graff, consented to a search of a bedroom she shared with the defendant in the search at issue in *U.S. v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Evidence was recovered from a diaper bag examined during the search. The lower court held that the search was unlawful because the Government had failed to show Mrs. Graff's actual authority to consent to a search of premises jointly occupied with the defendant. While ultimately remanding to the District Court, the Supreme Court stated, 94 S.Ct. at 993, that:

> More generally, in *Schneckloth v. Bustamonte*, 412 U.S. [218], at 245–246, 93 S.Ct. [2041], at 2057 [36 L.Ed.2d 854 (1973) ], we noted that our prior recognition of the constitutional validity of "third party consent" searches in cases like *Frazier* [*v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ] and *Coolidge v. New Hampshire*, 403 U.S. 443, 487–490, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971), supported the view that a consent search is fundamentally different in nature from the waiver of a trial right. These cases at least make clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or *other sufficient*

*relationship to the premises or effects sought to be inspected.* [emphasis added]

Concluding, 94 S.Ct. at 996, it held:

It appears to us, given the admissibility of Mrs. Graff's and respondent's out-of-court statements, that the Government sustained its burden of proving by the preponderance of the evidence that Mrs. Graff's voluntary consent to search the east bedroom was legally sufficient to warrant admitting into evidence the $4,995 found in the diaper bag.

More recently the Supreme Court has spoken in respect to the expectation of privacy [4] when a person places items under the control of a third party whose effects are then seized. The defendant in *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), was present when police arrived at a residence to serve an arrest warrant for another individual. There he remained while police left to get a warrant to search the house.[5] Rawlings had flown to Bowling Green a week before his arrest, met Cox and had spent a couple of nights at Cox's house. On the morning of the search, Rawlings placed his drugs in Cox's purse after allegedly securing her permission.

The Supreme Court stated, 100 S.Ct. at 2561–62:

In holding that petitioner could not challenge the legality of the search of Cox's purse, the Supreme Court of

---

**4.** Preliminarily, we note that the Supreme Court disfavored the use of the term "standing," as it relates to Fourth Amendment search and seizure issues. That Court favored the use of the terminology, in the Fourth Amendment arena, of "reasonable expectation of privacy," which does not carry with it "the 'arcane' concepts of property law" sometimes associated with "standing." *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The use of the term "standing," however, is still firmly embedded in modern legal culture, although its meaning in Fourth Amendment cases has evolved to conform to the dictates of the Supreme Court.

**5.** Only those who consented to be searched were permitted to leave, since the police had discovered quantities of narcotics during the arrest.

Kentucky looked primarily to our then recent decision in *Rakas v. Illinois, supra,* where we abandoned a separate inquiry into a defendant's "standing" to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a "legitimate expectation of privacy" in the area searched. See *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In the present case, the Supreme Court of Kentucky looked to the "totality of the circumstances," including petitioner's own admission at the suppression hearing that he did not believe that Cox's purse would be free from governmental intrusion, and held that petitioner "[had] not made a sufficient showing that his legitimate or reasonable expectations of privacy were violated" by the search of the purse. [*Rawlings v. Kentucky* ] 581 S.W.2d [348], at 350 [1979].

We believe that the record in this case supports that conclusion. Petitioner, of course, bears the burden of proving not only that the search of Cox's purse was illegal, but also that he had a legitimate expectation of privacy in that purse.[6] See *Rakas v. Illinois, supra,* 439 U.S., at 131, n. 1, 99 S.Ct., at 423, n. 1; *Simmons v. United States,* 390 U.S. 377, 389–390, 88 S.Ct. 967, 973–974, 19 L.Ed.2d 1247 (1968)....

Petitioner contends nevertheless that, because he claimed ownership of the drugs in Cox's purse, he should be entitled to challenge the search regardless of his expectation of privacy. We disagree. While petitioner's ownership of the drugs is undoubtedly one fact to be considered in this case, *Rakas* emphatically rejected the notion that "arcane" concepts of property law ought to control the ability to claim the protections of the Fourth Amendment. See 439 U.S., at 149–150, n. 17, 99 S.Ct., at 434, n. 17. See also *United States v. Salvucci,* 448 U.S. [83], at 91–92, 100 S.Ct. [2547], at 2552–2553 [65 L.Ed.2d 619 (1980) ]. Had petitioner placed his drugs in plain

---

6. The search in *Rawlings* was pursuant to a warrant.

view, he would still have owned them, but he could not claim any legitimate expectation of privacy. Prior to *Rakas,* petitioner might have been given "standing" in such a case to challenge a "search" that netted those drugs but probably would have lost his claim on the merits. After *Rakas,* the two inquiries merge into one: whether governmental officials *violated any legitimate expectation* of privacy held by petitioner. [emphasis added]

*Sartain v. United States,* 303 F.2d 859 (9th Cir.), *cert. denied,* 371 U.S. 894, 83 S.Ct. 194, 9 L.Ed.2d 127 (1962), was a Fourth Circuit case in which the defendant left a locked brief case and the key which unlocked it in a friend's kitchen cabinet. When that friend learned of appellant's arrest, she called a Mr. Zucher, who advised her to take it to a lawyer. She did so, and the lawyer then turned the briefcase over to the police. The key was missing. The police, aware that it was Sartain's briefcase, then broke into the briefcase, discovering heroin inside. The Court stated 303 F.2d at 862:

The thrust of appellant's argument on this point is that it was unreasonable for the officers, without a warrant, to open the briefcase and seize the narcotics upon the invitation of those who were then in control of the bag, and after appellant was in custody on a related charge. In considering this point, we adhere to the approach outlined in *United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950):

"The relevant test is not whether it is reasonable to procure a search warrant, but whether the search is reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment."

See also, *Harris v. United States,* 331 U.S. 145, 150, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399 (1947): " 'Each case is to be decided on its own facts and circumstances.' "

Here, we have a situation where a defendant delivers his briefcase and the means of access to it to another, thereby voluntarily surrendering to a large degree his right of privacy. Upon defendant's being arrested and charged on a closely related offense, the person then in control of the bag forwards it through intermediaries to the police. The police, with probable cause for a search, and with reason to believe that control of the bag had been surrendered to the persons who turned it in, conduct a search. The search turns up, not general evidentiary materials, but objects subject to immediate forfeiture and seizure— the very instrumentations of the crime. We cannot say of this activity, as was said in *Holzhey v. United States,* 223 F.2d 823 (5th Cir.1955), that it was unreasonable under the circumstances....

Several of our decisions also appear relevant to the Fourth Amendment issue in the case at bar. These include: *Tate and Hall v. State,* 32 Md.App. 613, 363 A.2d 622 (1976), where the search of a minor defendant's bedroom was upon the consent of his mother, the owner of the house. Incriminating evidence was seized from that room.[7] We said at 619–20, 363 A.2d 622:

This issue of third party consent was addressed under strikingly similar circumstances by this Court in *Jones v. State,* 13 Md.App. 309, 283 A.2d 184 (1971), *cert. denied,* 264 Md. 749 (1972). In that case the mother of a 20–year–old defendant gave permission for a search of his

---

7. The minor son was Tate. In referring to the other defendant, Hall, we said in a footnote:

We note a probable lack of standing in the case of appellant Hall to raise this issue since it nowhere appears that he had any interest in the premises subjected to the search. [citations omitted]

*Id.* [32 Md.App.] at 618, n. 1, 363 A.2d 622. We likewise note that Owens had no interest in the premises being searched in the instant case.

bedroom. There, as here, the mother testified that her son's bedroom was his alone, but that he paid no rent. The Court found as dispositive, in upholding the validity of the search, the fact that:

> "Appellant's mother had the sole control, power and superior right to exclude others, including the appellant, from her home, and also from the very bedroom that the appellant used. It was her free and voluntary choice to allow the police to search her house." *Id.,* 13 Md.App. at 315 [283 A.2d 184] (citations omitted).

While it is true that in *Jones* the defendant was present and offered no objection when consent for the search was given, we do not consider that fact significant. What is crucial and dispositive, in our view, is that Harper possessed not only a common authority with Tate over the searched premises, but in fact possessed superior authority under these circumstances, including the right to exclude him from the premises.

It is equally clear in the case at bar that Gardin had "sole control, power and superior right to exclude others, including the appellant, from her home ...."

*McDonald v. State,* 61 Md.App. 461, 487 A.2d 306 (1985), involved a situation where an adult daughter of the owner of the house gave consent to the police for them to search the bedroom shared by the mother and the defendant. A motion to suppress was denied. On appeal, we said:

> Premises may be searched without a warrant when voluntary consent to search the premises is given. *U.S. v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The prosecution is not limited to proof that the consent was given by the defendant. The search will be deemed valid if voluntary consent is obtained from a third party who possessed common authority over or *other sufficient relationship to the premises or effects sought to be inspected....*

*Id.* at 470, 487 A.2d 306 (emphasis added).

After consenting to a search of her apartment, Gardin directed the searching officers to the bags saying, "They

had just brought it here this morning and if there's any drugs it would be in there...." The Court of Appeals in the recent case of *Doering v. State*, 313 Md. 384, 545 A.2d 1281 (1988), was concerned with multiple issues including the issue of a consensual search of a school bus that had been modified as living quarters. When Doering and his busmate, Reinhardt, were asked if anybody remained on the bus, Doering remained silent but "Reinhardt answered that there was no one else, and said 'go check for yourselves,' or words to that effect." *Doering*, at 401, 545 A.2d 1281. The officers entered the bus and removed weapons, some of which were apparently introduced at the trial. The Court stated at 394, 545 A.2d 1281:

> The concept of a reasonable expectation of privacy in a particular place is not simplistically singular. It involves, instead, a bundle of privacy interests. One who closes the door to a glass telephone booth may have a reasonable expectation of privacy as to what he is about to say, but no reasonable expectation that the number he dials may not be seen by a casual observer outside the booth. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Similarly, one may have a legitimate expectation that police officers will not conduct a warrantless intrusive search of the curtilage to his home, but have no reasonable expectation that police officers will not simply enter a portion of that curtilage in the course of an investigation. Doering enjoyed no constitutionally reasonable expectation that police officers would be excluded from the place where they confronted him.

The Court, in discussing warrantless searches, discussed the issue of intrusions saying at 397, 545 A.2d 1281: "In assessing the gravity of an intrusion, we consider the *objective expectation of privacy that reasonably existed,* and the extent to which it was invaded." (emphasis added) It concluded its discussion on the consent issue at 402, saying:

> We think a most important consideration is the fact that the consent was volunteered, and was not given in re-

sponse to a request by the police. It is difficult to conceive of the consent merely being an acquiescence to the commanding presence of the police when the idea for the search originated with the persons being detained.

While it is clear in the case at bar that the idea for the search originated with the police, it is equally clear that the idea that the drugs were in the bags originated with the tenant who expressly directed the officers to the bags. Owens had no legitimate expectation of privacy in Gardin's apartment. Owens surrendered substantial control of the bag when he had Gardin transport it to premises over which he had no control. He likewise had no reasonable expectation that Gardin, if confronted by accusations that drugs had just been delivered to her, would not attempt to exculpate herself by directing the officers to the unlocked bags she had delivered to her own house at appellant's request.

Gardin possessed the bag in the capacity of a gratuitous bailee. There was no evidence that she had received any instructions not to open the bags, nor did she violate any other instructions given to her by Owens when she consented to the search of the bag. According to the testimony, at the time the officers obtained Gardin's consent, the facts available to the officers supported a theory that the bags had been delivered to the tenant. The police could have inferred, based upon the tenant's response, that she was the ultimate deliveree of the bags and that she in fact possessed whatever drugs were contained therein. Thus, the tenant had an apparent possessory interest in the bags, a real interest in the premises, and apparent authority to consent to the search of the bags. We believe she therefore had a sufficient relationship to the bag in question to consent to the search.

The facts in the case at bar are similar to those in *Thompson v. State*, 62 Md.App. 190, 488 A.2d 995 (1985), which involved the search of a briefcase found in a hotel room which the police were searching pursuant to a warrant. The search was being conducted for the purpose of discovering controlled dangerous substances. Unlike the

instant case, however, the officers had no reason to believe that the briefcase belonged to the defendant.

We held that Thompson had Fourth Amendment standing to litigate the search and seizure issue. We said at 200–01, 488 A.2d 995:

> We agree with the appellant as to his standing to challenge the search of the briefcase. When the officers were initially searching the motel room, they were searching both the room at large and all containers within it for "controlled and dangerous substances and the items used in their manufacture, distribution and use." *Without suggesting that it would have made any difference*, we note that the officers had no reason to believe that the briefcase under the bed was the special property of the appellant, as distinguished from any other closet, drawer, box, suitcase, or purse examined in the course of the larger search. The reasonableness of the police behavior has nothing, however, to do with standing to object. The reasonableness of police conduct, assessed from their subjective point of view in light of the facts available to them at the time of the search, bears only upon the merits of Fourth Amendment satisfaction. Standing to object, on the other hand, is assessed objectively in terms of the actual, historic facts that are developed at the time of the suppression hearing itself. [emphasis added]

> At the suppression hearing, it was developed that the appellant's photograph and identification papers were in the briefcase. We conclude that this was enough to entitle him to standing to litigate the constitutional propriety of the search of that briefcase. Standing to object, however, by no means suggests that the appellant will win upon the Fourth Amendment merits; it simply entitles him to litigate the Fourth Amendment merits.

We concluded, at 218, 488 A.2d 995:

> What emerges is that the police in this case were conducting a reasonable and constitutional search of the motel room for evidence of narcotics and narcotics paraphernalia. That authorized them to search any closet,

drawer, box, suitcase, or other container—including the appellant's briefcase—that might have been used to store or conceal such contraband. The appellant had standing to litigate the search of his briefcase; the appellant loses on the merits of that litigation.

Likewise, the police in the case sub judice were conducting a reasonable search of the premises, since they had the tenant's consent.

The facts in *Bratt v. State*, 62 Md.App. 535, 490 A.2d 728, *cert. denied*, 304 Md. 95, 497 A.2d 818 (1985), indicated that while conducting a consent search the police learned that several containers had been left by a prior tenant (the defendant). They discovered evidence in the containers.

We stated, at 540, 490 A.2d 728:

Appellant contends that the warrantless search of the cardboard boxes cannot be justified under the theory of abandonment or consent. We disagree. Diehl had exclusive control over the premises that she rented from Lohr. Under these circumstances, she had full authority to consent to the search of the entire premises.

\* \* \* \* \* \*

We hold that Diehl's control over the entire premises warranted her consent to search unsealed boxes in the open basement.

The Pennsylvania case of *Com. v. Latshaw*, 481 Pa. 298, 392 A.2d 1301, 392 A.2d 1301, *cert. denied*, 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979), involved a factual situation where Mr. Hinds, a relative of the owner of a barn, who had permission to store items therein, then subsequently gave permission for Latshaw to store drugs and containers in the barn. The owner subsequently consented and/or requested that the police examine the contents of the containers. Judge Roberts, in a dissent, clearly framed the issue, saying:

The majority justifies today's exception from the well-settled warrant requirement of both the federal and Pennsylvania Constitutions on the theory that Minnie Bubb,

owner of the barn in which the closed boxes and footlockers were found, but not the owner of these storage containers, could "consent" to the officers' opening the containers.

*Id.*, 392 A.2d at 1307. The key factual distinction between *Latshaw* and the case at bar was that the owner in *Latshaw* did not know the containers were in her barn, whereas in the instant case, the person in control of the premises was the one that placed the container in the premises searched.

The *Latshaw* majority discussed the law:

The Fourth Amendment does not preclude a warrantless search of property when consent is given by a person possessing the authority to consent to such search.

\* \* \* \* \* \*

Mr. Hinds' [an accomplice of Latshaw] use of the barn ... was gratuitous and not pursuant to any type of lease arrangement.

\* \* \* \* \* \*

In any event the third party consent exception to the warrant requirement is firmly established. *South Dakota v. Opperman, supra* [428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) ]; *U.S. v. Matlock, supra; Schneckloth v. Bustamonte, supra; Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). The basis for the principle that the consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared, is discussed at length in *United States v. Matlock,* supra. In *Matlock,* the Court focused upon the joint access or control, "so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others assume the risk that one of their number might permit the common area to be searched." *Id.* 415 U.S. at 171, n. 7, 94 S.Ct. at 993.

A close reading of the above quoted language from *Matlock* indicates that the test is not based merely on

appellant's subjective expectation of privacy, but rests also on a finding that said expectation was reasonable. In determining what is "reasonable" all the surrounding facts and circumstances must be considered. [footnote omitted]

*Id.* 392 A.2d at 1304–05.

As we perceive it, the appellant relinquished control over his bag to Ms. Gardin. Gardin, according to appellant's testimony, then transported the bag to her house, over which she had sole control. Not only did she have the right to deny entry to the officers, she had the right to deny entry to Owens. Mr. Owens had no specific plans to recover the bag within a reasonable time and the record reflects that he never made any effort to recover or make any inquiry in respect to the bag. He did not inform Gardin of any specific plans in regard to the bag other than to tell her to take it to her house.

We believe that Gardin's control over the bag was sufficient for her to consent, in the manner that she did, when confronted by police that they "had information that the drugs had been brought to her house by men from Florida." At this point, Gardin, at the least, had been advised that she and/or her apartment were suspected of being involved with drugs. Not only was she the actual person who had transported the bag to her apartment, it was in an area under her exclusive control. She was under no direction not to open the bags. She may well have also believed that it was necessary for her to consent in order to exculpate herself as a suspect. This motivation, together with the fact that she delivered the bag to the premises, had sole control of the premises, had no instructions from the defendant as to how to maintain control over the bags or even as to when he would return, constituted a circumstantial, factual totality sufficient for the trial court to hold that Owens had an insufficient expectation of privacy in the bag, and that under that totality, the search was not unreasonable, and thus was not in violation of the Fourth Amendment.

■ We hold that a third-party gratuitous bailee of a container may give valid consent to police to search that container where the bailee has exclusive physical control over the item, where the bailee is in a position to deny the owner of the item physical access to it, and where the bailee is in an inculpatory position as a result of the bailment. Under these circumstances, the owner of the item has relinquished control over the item to a sufficient degree to undermine his or her expectation of privacy in the item. With the expectation of privacy eroded, the owner has no valid Fourth Amendment search and seizure complaint regarding the legality of the search of the item.

Were we to hold otherwise, sophisticated couriers of contraband might soon avail themselves of the following scenario as a means of avoiding prosecution for these offenses: The courier engages a third-party to take control of the contraband. The third-party, if accosted, then consents to a search in order to exculpate himself or herself, but denies ownership of the item. The true owner of the item then has the evidence suppressed, based upon a violation of his or her own expectation of privacy.

We hold that under the total atmosphere of this case, whatever subjective expectation of privacy appellant retained in the bag was objectively unreasonable. Accordingly, we affirm.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.