589 A.2d 86

**STATE of Maryland**

v.

**Anthony CLOWNEY.**

**No. 1670, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 1, 1991.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank R. Weathersbee,

State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellant.

Bruce Ezrine (David A. Castro, on the brief), Baltimore, for appellee.

Argued before GARRITY, FISCHER and CATHELL, JJ.

GARRITY, Judge.

The appellee, Anthony Clowney, charged with possession of controlled dangerous substances with intent to distribute, successfully moved to suppress the evidence. The State noted its appeal to this court, pursuant to Cts. & Jud.Proc. Art., § 12–302(c)(3), arguing that the trial court, the Circuit Court for Anne Arundel County, erred in suppressing the evidence which had been seized pursuant to a consent search of the vehicle.

By per curiam order dated April 11, 1991, we reversed the order granting the motion to suppress. We now give our reasons for the determination.

The court below found that the police had requested the appellee's consent to search and that he had given his consent. The court, nevertheless, ruled to suppress the evidence on the grounds that there was nothing to demonstrate that the appellee knew he could have withheld consent. Viewing the court's ruling in light of *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and its progeny, the issue before us is elegant in its simplicity: whether the lower court erred in suppressing evidence solely on the grounds that the appellee did not know that he could withhold consent.

## Statement of Facts

On June 21, 1990, the Anne Arundel County Police set up a speed trap on the northbound side of the Baltimore Washington Parkway and detected the appellee's car traveling approximately 75 miles per hour. Upon stopping appellee's vehicle, Officer Samuel Sweet approached the vehicle

and informed the appellee of the traffic violation. After running a warrant and license check, the officer returned to the appellee's car, issued him a warning ticket, and returned his license and registration. At this point, the officer advised the appellee that he was free to leave and informed him that, although he was making traffic stops, his primary function was to interdict the transportation of illegal drugs on the Baltimore Washington Parkway. The officer testified that he then asked the appellee if he could look through his car. According to Officer Sweet, the appellee replied, "Sure," as he opened the car door and stepped out of the vehicle.

A second Anne Arundel County police officer, Officer Dean D'Camera, was working with Officer Sweet at the speed trap. When D'Camera finished with two other vehicles which had been stopped on the other side of the highway, he walked over to the appellee's car and entered into a conversation with the appellee, who was standing near the rear of the vehicle. While Officer D'Camera and the appellee conversed, Officer Sweet began to search the appellee's car and immediately found beneath the driver's seat a black change purse containing two small baggies of white powder and a small baggie of green leafy material.

The appellee was then arrested, and a search incident to his arrest recovered 17 baggies of marijuana, a large freezer bag of marijuana, and two baggies of cocaine in the trunk of the car. Also in the trunk the police found 230 empty sandwich bags, one bottle of inositol, one box of razor blades, one hand-held scale, one pair of scissors, 160 small baggies, $843 in currency, and a box of papers containing names, addresses, phone numbers, and other notes.

At the suppression hearing, Officer Sweet testified that the appellee had not signed a consent form prior to the search. He further testified that he did not carry consent forms in his vehicle and used them only occasionally because they are not required. The officer estimated that he had used consent forms in very few of the nearly one hundred consent searches he had conducted in Anne Arun-

del County. He further testified that he frequently asked the drivers of vehicles stopped under the same circumstances as the appellee's if he could search the car; and, if the driver refused the search, the officer would tell the driver that he was free to leave.

Officer D'Camera testified that after Officer Sweet had written the warning violation for the appellee, Sweet had indicated to D'Camera that he intended to ask the appellee to consent to a search of his vehicle. D'Camera testified that although he did not hear the initial part of the conversation between Officer Sweet and the appellee, he observed the appellee step out of the car, hand the keys to Officer Sweet and say, "Sure," or "something to that effect." Officer D'Camera further testified that while Officer Sweet conducted the search, the appellee said, in reference to Officer Sweet, "You know, that's a pretty cool cop. He only gave me a warning." Officer D'Camera replied, "Yeah, he's a hell of a nice guy. That's a pretty lucky break. You know you were seventy-three in a fifty-five." The appellee then stated, "Yeah, I understand. You guys are just out here doing your job." At that point, Officer Sweet had found the drugs in the change purse under the front seat and indicated to Officer D'Camera that he was to place the appellee under arrest and search the car incident to the arrest.

The appellee testified that while he was returning to his home in Baltimore from Washington, the police stopped his vehicle for speeding, along with three other vehicles, and that Officer Sweet had issued him a warning ticket for exceeding the speed limit. He further stated that he did not consent to the search of his vehicle, that Officer Sweet had not asked his permission to search the car, and that he had not been advised that he could withhold his consent. He also denied having any conversation with Officer D'Camera prior to his arrest.

In ruling to suppress the evidence, the trial judge found as follows:

[O]ne of the problems that has developed over time is that consent searches that are obtained orally and not in writing, with not full explanation to the defendant of his rights not to be searched, necessitated the drawing up of a form so that the trier of fact, either the court or the jury, knew the defendant knew his right and knew he didn't have to consent.

*In this case, I don't think there's any question that Officer Sweet asked him if it would be all right to search the car and he said, "Sure."* I think that's inherent in what was said, but I think Mr. Clowney didn't fully understand the implications of what that consent involved and that he had a right to say, "No, I don't want you to search," and that he had a right to get in his car and just drive off. I don't think that was clear to Mr. Clowney, and I think that had to be clear before you can have valid consent.

So I think the consent obtained here was not reasonable and for that reason I am going to grant the Motion to Suppress. I also think that it ought to be made clear in this whole interdiction process that the consent that is obtained must be done in writing just for the valid purpose. And here we don't even have a second officer that heard the alleged consent. And I think in all fairness to everybody and for better prosecutorial evidence, there should be written consent so that the defendant is ... the court or the jury is fully aware of the fact that the defendant knew what he was consenting to, *knew that he had a right not to consent,* because he certainly had a right in this situation not to consent. [Emphasis added.]

## Analysis

■ The State contends that the trial court erred in suppressing the evidence obtained as a result of the consent search of the appellee's vehicle. *We agree.*

■ It is now well established that a police officer may conduct a warrantless search and seizure if he has an individual's voluntary consent to do so. *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). To determine whether the appellee's consent was voluntary, we must view the circumstances surrounding his consent in their totality. *Id.* at 226, 93 S.Ct. at 2047.

In delineating the contours of voluntariness in the consent search situation, the Court in *Schneckloth* established that consent to a search is voluntary even in the absence of the defendant's knowledge that he could withhold consent. 412 U.S. at 231–33, 93 S.Ct. at 2049–51. Enunciating the standard for evaluating whether consent has been given voluntarily, the Court in *Schneckloth* stated that "the absence of proof that [the defendant] knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance." *Id.* Age, intelligence, lack of education are other factors that a court may consider, but none of these may be elevated to the stature of a controlling criterion. 412 U.S. at 226, 93 S.Ct. at 2047. Indeed, even "custody alone has never been enough in itself to demonstrate a coerced confession or consent to a search." *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

██ The lower court suppressed the evidence on the ground that the police officer, after having obtained the appellee's consent, did not use a consent form to memorialize the appellee's understanding that he had a right to refuse consent. The court surmised that the development of consent forms evolved from a need for the factfinder to be certain that the defendant has given consent to a search where he "knew his rights and knew he didn't have to consent." As a matter of law under *Schneckloth*, this statement is erroneous.[1]

---

1. A consent form is not required to demonstrate that consent to search a vehicle was given voluntarily. *Schneckloth*, 412 U.S. 218, 93 S.Ct. 2041 (consent to search vehicle voluntary in absence of consent form); *accord, Smith v. State*, 62 Md.App. 627, 490 A.2d 1307 (1985) (same). Consent forms do appear with some regularity, however, especially in cases that have upheld third party consent to search premises against a challenge on the basis of voluntariness. *See e.g.,*

In *Schneckloth,* the Court rejected the argument that the person giving consent must have knowledge of the right to refuse:

> One alternative that would go far toward proving that the subject of a search did know he had a right to refuse consent would be to advise him of that right before eliciting his consent. *That, however, is a suggestion that has been almost universally repudiated by both federal and state courts, and, we think, rightly so.* For it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning. Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions.... These situations are a far cry from the structured atmosphere of a trial where, assisted by counsel, if he chooses, a defendant is informed of his trial rights. 412 U.S. at 231–32 [93 S.Ct. at 2049–50]. [Emphasis added.]

We wish to emphasize that the Court in *Schneckloth* held that knowledge of the right to refuse consent is only one factor to be taken into account in determining voluntariness. 412 U.S. at 231–33, 93 S.Ct. at 2049–51 (footnotes omitted). In rejecting the contention that a knowing and intelligent waiver, as required in *Miranda* cases, also should be required for a valid consent search, the Court distinguished those rights guaranteed to a defendant in a trial setting from the rights guaranteed under the Fourth Amendment. 412 U.S. at 241, 93 S.Ct. at 2055. The Court reasoned that in the trial setting, the Constitution mandates basic protections that are indispensable to a fair trial, whereas the Fourth Amendment has "nothing to do with the fair ascertainment of truth at a criminal trial. Rather

---

*McMillian v. State,* 85 Md.App. 367, 584 A.2d 88 (1991) (nightclub manager signed consent form authorizing police to search premises); *Owens v. State,* 83 Md.App. 353, 574 A.2d 362 (1990) (third party signed form authorizing police to search premises and luggage therein).

... the Fourth Amendment protects the 'security of one's privacy against arbitrary intrusion by the police.' " *Id.* at 242, 93 S.Ct. at 2055 (quoting *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)).

Confronted with facts much like those of the case *sub judice*, the Court in *Schneckloth* recognized:

> Any defendant who was the subject of a search authorized solely by his consent could effectively frustrate the introduction into evidence of the fruits of that search by simply failing to testify that he in fact knew he could refuse to consent. And the near impossibility of meeting this prosecutorial burden suggests why this Court has never accepted any such litmus-paper test of voluntariness. 412 U.S. at 230, 93 S.Ct. at 2049.

At this point, we pause to review the circumstances that render consent involuntary. Here, as is often the case, the appellee did not comprehend the consequences of his consent. This, however, does not render his consent involuntary. Consent is involuntary if it has been obtained by coercion. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59. Consent is coerced if it is obtained by threats or force, or if it is granted only in submission to a false claim of lawful authority. *Doering v. State*, 313 Md. 384, 402, 545 A.2d 1281 (1988) (citing *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047); *see also, Gamble v. State*, 318 Md. 120, 125, 567 A.2d 95 (1989) (threats, express command or insistence on actual or alleged right to search vitiates consent). Other circumstances that may render consent involuntary arise when the person giving consent has been affirmatively misled about his or her option to refuse the search. *Titow v. State*, 75 Md.App. 555, 542 A.2d 397 (1988).

As indicia of coercion, the appellee directs us to the fact that Officer Sweet's stated objective in conducting the search of the vehicle was that of drug interdiction, and the fact that the officer had told him that the search was "routine."

Viewed under the totality of the circumstances, the record reflects that after Officer Sweet had issued the

appellee the warning ticket, he advised the appellee that he was free to leave. When the police officer stated that the reason for requesting consent to search was drug interdiction, the 29–year–old appellee, who has an eleventh grade education, said, "Sure." The fact that the officer stated that the search was routine does not rise to the level of a false assertion of lawful authority because the officer asserted no claim of authority to search the vehicle. *Compare Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (police falsely claimed to have warrant to search home of elderly widow, which was located in an isolated rural area).

Moreover, there was no show of force by the police, and the record suggests that the communications between the appellee and the police officers were amiable, at least before the cocaine and marijuana were discovered. We do not believe that such a series of events rose to the level of coercion. *See Millwood v. State*, 72 Md.App. 82, 98, 527 A.2d 803 (1987), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988) (citing by way of comparison *Whitman v. State*, 25 Md.App. 428, 336 A.2d 515 (1975)).

For the stated reasons, we issued our per curiam order on April 11, 1991, reversing the order of the trial court.